# Exhibit M



27,458,360 articles and books

● Periodicals  ○ Literature

Search

● Keyword  ○ Title  ○ Author  ○ Topic

# Foreign sovereign immunity and comparative institutional competence.



Link/Page Citation

ABSTRACT

Policymakers and legal scholars routinely make "comparative institutional competence" claims--claims that one branch of government is better at performing a specified function than another, and that the more competent branch should be in charge of that function. Such claims pervade American law and policy, but they are rarely evaluated with rigor.

We take advantage of an unusual legislative experiment to conduct what we believe to be the first systematic empirical analysis of the comparative institutional competence of the executive and judicial branches in a critical field of American law and policy: U.S. foreign relations. From 1952 to 1976, the U.S. State Department decided whether foreign nations would receive sovereign immunity from suits in U.S. courts. Based on the perception that the State Department's sovereign immunity decisions were overly influenced by political considerations, Congress passed the Foreign Sovereign Immunities Act of 1976 (FSIA), which transferred immunity decisionmaking authority to the judiciary. This transfer was based on an explicit comparative institutional competence claim: that courts are better equipped than the State Department to make immunity decisions based on law rather than politics.

To rigorously evaluate this fundamental claim, we created and analyzed an extensive dataset of foreign sovereign immunity decisions made by the State Department and the U.S. district courts over the last fifty years. Our principal findings are threefold. First, we find little evidence that political factors systematically influenced the State Department's immunity decisions. Second, there is strong evidence that political factors have systematically influenced the courts' decisions. Third, the transfer of immunity decisionmaking authority to the courts did not significantly affect the likelihood of immunity.

All three findings challenge both the underlying comparative institutional competence claims that supported the FSIA's passage and more general conventional understandings about the proper allocation of authority between the executive and judicial branches. To be sure, there may be valid reasons for the judiciary to play a leading role in immunity decisionmaking, and possibly other areas of U.S. foreign relations as well. But our analysis casts doubt on the widely made comparative

institutional competence claim that the judicial branch is necessarily better equipped than the executive branch to make foreign relations law decisions free from systematic political influence.



Hillsong A Megachurch Exposed — Skip Ad advertisement

```
                                       L COMPETENCE
                                       nstitutional Choice
                                       he State Department
                                       he Courts
                                        STRATEGY
                                       mmunity Dataset
        1. State Department Decisions
        2. U.S. District Court Decisions
     B. Coding Decisions and Measuring Legal and Political
        Influences
        1. Decision
        2. Potential Legal Influences on Immunity Decisions
        3. Potential Political Influences on Immunity Decisions
III. EVALUATING THE CLAIMS: FINDINGS
     A. Before the FSIA: Factors Influencing the State
        Department's Foreign Sovereign Immunity Decisions
        1. Bivariate Analysis: The Influence of Individual
           Legal and Political Factors
        2. Multivariate Analysis: The Combined Influence of
           Multiple Legal and Political Factors
     B. After the FSIA: Factors Influencing the Courts'
        Foreign Sovereign Immunity Decisions
        1. Bivariate Analysis: The Influence of Individual
           Legal and Political Factors
        2. Multivariate Analysis: The Combined Influence of
           Multiple Legal and Political Factors
        3. Legal and Political Influences on the U.S. District
           Courts' Immunity Decisions: Interpreting the Evidence
     C. The FSIA and the Likelihood of Immunity
        1. Comparison of Immunity Rates Before and After the FSIA
        2. Multivariate Analysis: Controlling for Other Potential
           Influences on the Likelihood of Immunity
     D. Assessing the Strength of Our Findings
IV.  BROADER IMPLICATIONS
     A. Foreign Official Immunity
     B. Comparative Institutional Competence and Foreign Relations Law
     C. Doctrinal Clarity and Impartiality
     D. Empirical Research on Comparative Institutional Competence
CONCLUSION
APPENDIX A: SUMMARY STATISTICS
APPENDIX B: TRADITIONAL REGRESSION TABLES
```

Malamut & Associates, LLC

Unpaid Wages?

INTRODUCTION

Judges, legislators, and legal scholars often make "comparative institutional competence" claims--claims that one branch of government is better at performing a specified function than another. Based on such claims, they argue for legal rules delegating a function to a particular branch of government, or requiring one branch to defer to another when performing that function. (1)

Comparative institutional competence claims pervade American law and policy. (2) For example, one of the Supreme Court's rationales for its Chevron doctrine of judicial deference to agency interpretation of statutes is that the agencies charged with administering those statutes are better suited than courts to interpret them. (3) Whether a federal court will dismiss a suit based on the political question doctrine in deference to a political branch of government depends on whether there are "judicially discoverable and manageable standards for resolving [the question]" and whether it is possible to decide the question "without an initial policy determination of a kind clearly for nonjudicial discretion." (4) Comparative institutional competence claims are also at the center of debates over the appropriate role of the judicial and executive branches in numerous other fields, such as counterterrorism, (5) government mining of personal data, (6) extradition, (7) and human rights. (8)

As these examples suggest, comparative institutional competence claims are important. (9) Lawmaking and policymaking depend not only on setting social goals, but also on deciding who has the authority to determine how to pursue those goals. (10) Because one institution may be better able to implement those goals than another, the impact of a legal rule or policy depends on which institution has that authority. (11) As Neil Komesar concludes in his landmark book on the subject, "institutional choice is an essential part of law and public policy choice, and, therefore, comparative institutional analysis is an essential part of any analysis of law and public policy." (12) "[D]eciding who decides" matters. (13) But that crucial institutional choice can only be as sound as the comparative institutional competence claims upon which it is based.

Unfortunately, comparative institutional competence claims are rarely evaluated rigorously. (14) As Komesar laments, too often competence claims in favor of particular institutions are simply treated as "intuitively obvious," dealt with "as an afterthought," or defended with a recitation of "a long parade of horribles" that would result from an allocation of authority to a rival institution. (15) Contributing to this problem is a lack of systematic empirical analysis of comparative institutional competence claims. (16) As William Eskridge notes,

```
most of the generalizations needed to advance a comparative
institutional analysis rest upon factual beliefs that are not
supported by empirical data or even a representative array of case
studies.... [P]recious little empirical work [has] even been
attempted.... [I]t is disturbing that comparative institutional
analysis of public law often rests upon confident, even dogmatic,
factual assertions that are completely unsupported. (17)
```

Foreign relations law is one area where comparative institutional competence claims are frequently made with little empirical evidence. At the most general level, scholars and policymakers are debating whether the executive branch is better equipped to make foreign relations law decisions because of its superior ability to weigh political considerations, or whether these determinations should be left to the courts because they are insulated from political pressures. In these debates, arguments for judicial deference to the executive branch in foreign relations are both defended (18) and criticized (19) based on claims about the competence of the courts and the executive branch. But these debates have unfolded based almost exclusively on anecdotes and untested assumptions. (20)

The debate over comparative institutional competence in foreign relations law has not been confined to academia, but frequently plays out in the courts as well. For example, when the Supreme Court established the act of state doctrine--which bars courts from questioning the validity of public acts of foreign sovereigns within their borders--in the landmark case Banco Nacional de Cuba v. Sabbatino, the decision directly hinged on the "competency of dissimilar institutions [i.e., the executive and the judiciary] to make and implement particular kinds of decisions in the area of international relations." (21) More recently, since the Supreme Court's 2010 decision in Samantar v. Yousuf, (22) the lower courts have been grappling with

whether the executive or judicial branch should determine whether individuals should be given immunity from suit because they were acting as foreign government officials. The U.S. government argues that the courts should give it absolute deference on foreign official immunity matters, (23) while others argue that the courts should decide these matters. (24) Both the academic debate and judicial decisions have been hampered, however, by the lack of rigorous, empirical evidence about whether there are systematic differences in the way that the executive and judicial branches make decisions about foreign relations law.

In this Article, we begin tackling this problem. We take advantage of an unusual historical occurrence--a legislative experiment, whereby a specific governmental function was transferred from one branch of government to another--to undertake a systematic empirical analysis of the comparative institutional competencies of the executive and judicial branches to make foreign relations law decisions.

The function we investigate is foreign sovereign immunity decisionmaking. According to the foreign sovereign immunity doctrine, a foreign state is immune from suit in a U.S. court unless an exception to immunity applies. (25) Foreign sovereign immunity is a core doctrine of U.S. foreign relations law, (26) implementing a fundamental principle of international law: one nation ordinarily cannot be sued in another nation's courts. (27) The doctrine is important both formally, as an expression of the independence and legal equality of sovereign states, (28) and practically, as a way of fostering friendly international relations. (29) For many years, the U.S. State Department was responsible for deciding whether foreign states would enjoy immunity in particular lawsuits. (30) However, legal scholars and lawyers--including lawyers from the State Department itself--argued that the State Department's immunity decisions were overly influenced by political factors and insufficiently based on the law of sovereign immunity. (31) In response to these concerns, Congress passed the Foreign Sovereign Immunities Act of 1976 (FSIA), (32) which transferred the foreign sovereign immunity decisionmaking function to the judiciary. (33)

This transfer of authority was based on an explicit comparative institutional competence claim: that the courts would be better than the State Department at making immunity decisions based on law rather than politics. (34) Because the validity of this claim could not be established ex ante, the FSIA's transfer of foreign sovereign immunity decisionmaking from the executive branch to the judicial branch represents an experiment in comparative institutional competence. Since the passage of the FSIA, experts have argued that the transfer did indeed substantially depoliticize foreign sovereign immunity decisionmaking. (35) But these ex post assessments have yet to be empirically scrutinized.

By statistically analyzing newly collected data on executive branch and judicial branch performance of foreign sovereign immunity decisionmaking, we evaluate the FSIA's experiment in comparative institutional competence. We find little evidence that political factors were systematically related to the State Department's foreign sovereign immunity decisions. (36) And, contrary to the FSIA's underlying comparative institutional competence claim and ex post assessments of that claim, we find significant evidence that political factors are related to the judiciary's immunity decisions. (37) Moreover, although the transfer of foreign sovereign immunity decisionmaking was partly intended to facilitate court access for suits against foreign states, (38) we find that even after controlling for a variety of case-specific legal and political factors, the courts are as likely as the State Department was to grant immunity. (39)

We present our analysis in four main parts. Part I sets the stage by explaining the foreign sovereign immunity doctrine and its relationship to institutional choice, and by analyzing the FSIA's legislative history to uncover the comparative institutional competence claim that provided the rationale for the FSIA's transfer of the foreign sovereign immunity decisionmaking function from the executive branch to the judicial branch. In short, the FSIA promised to depoliticize foreign sovereign immunity decisionmaking by transferring the function to a supposedly more competent institution--the judicial branch. The FSIA's legislative history also indicates that another purpose for the transfer was to enhance court access for litigants in claims against foreign sovereigns.

Part II presents our empirical methodology. We began by creating a foreign sovereign immunity dataset (FSI Dataset) containing detailed information about all 118 available foreign sovereign immunity decisions by the State Department between 1952 and 1976 and approximately 380 foreign sovereign immunity decisions by U.S. district courts since 1976. We then assembled extensive additional data on a wide range of legal and political factors that potentially influence foreign sovereign immunity decisionmaking, and incorporated that data into the FSI Dataset. Finally, we used statistical methods to analyze the dataset. We used these techniques to test for legal and political factors that predict the State Department's and U.S. district courts' foreign sovereign immunity decisions, and to determine whether the likelihood of a grant of immunity is related in a statistically significant way to which institution has decisionmaking authority.

Part III presents our results. While we explore many nuances in the pages that follow, our principal findings are threefold. First, we find little evidence that political factors were systematically related to the State Department's immunity decisions. Of course, political factors may have played an important role in some individual cases. But our results suggest that the State Department was more competent as a foreign sovereign immunity decisionmaker than was widely believed at the time of the FSIA's adoption.

Second, we find evidence that political factors--including the foreign state's economic strength, the nature of the foreign state's political system, and the judge's political ideology--are systematically related to the judiciary's foreign sovereign

immunity decisions. All else being equal, the courts appear more likely to grant immunity to wealthy, democratic allies than to other nations; conservative judges appear less likely to grant immunity than liberal judges; and judges appear more likely to grant immunity when there is a U.S. plaintiff than when there is not. On the other hand, there is evidence that legal factors have an influence, too. In particular, two legal factors--commercial activity and U.S. contacts--affect the courts' foreign sovereign immunity decisions in commercial activity exception cases. More subtly, it also appears that ideological influences are more subdued in areas where the foreign sovereign immunity doctrine is better developed, which is consistent with prior findings that doctrinal clarity can constrain judicial discretion.

Third, it does not appear that it has been any easier for plaintiffs to gain court access in suits against foreign sovereigns since the FSIA's transfer of immunity decisionmaking from the State Department to the courts. Overall, our findings suggest that the FSIA's experiment in institutional choice may not have been as successful--and perhaps may not have been as necessary--as is almost uniformly assumed. Contrary to the FSIA's comparative institutional competence rationale, the State Department's decisions do not appear to have been systematically politicized, yet there do appear to be systematic political influences on the district courts' decisions.

Part IV explores the broader implications of our analysis. Beyond our specific findings regarding foreign sovereign immunity decisionmaking by the State Department and the district courts, our analysis informs intensifying post-Samantar debates over the appropriate roles for the executive branch and the judicial branch in foreign official immunity decisionmaking. The analysis sheds much needed empirical light on more general debates about comparative institutional competence in foreign relations law, reinforces prior research on the relationship between doctrinal clarity and judicial impartiality, and illustrates a methodological approach that can be used for evaluating comparative institutional competence claims in ways that move beyond mere theory and anecdotal evidence.

As two prominent foreign relations law scholars acknowledge in the context of their own comparative institutional competence claims in favor of the executive branch, those claims necessarily rely "on certain generalizations and assumptions about how these institutions work because it is difficult to imagine a sufficiently rigorous empirical test of these functional claims." (40) We do not claim to have a perfect empirical solution; but given the dearth of empirical analysis of comparative institutional competence claims--in foreign relations law or otherwise--we think our analysis is a step forward. And while generalizations from our specific findings should be made with caution, our analysis suggests that, even if the judiciary may have institutional advantages over the executive branch, it is not clear that these advantages include the ability to depoliticize matters that touch on foreign affairs or that the executive branch is unable to make sound legal decisions.

I. THE FSIA'S COMPARATIVE INSTITUTIONAL COMPETENCE CLAIMS

The State Department was widely criticized for making foreign sovereign immunity decisions that were excessively influenced by political considerations and insufficiently based on the law of foreign sovereign immunity. One of the primary purposes of the FSIA was to depoliticize foreign sovereign immunity decisionmaking. To accomplish this, the FSIA transferred the foreign sovereign immunity decisionmaking function from the State Department to the courts. Underlying this institutional solution to the problem of politicization was a particular comparative institutional competence claim: that the courts would be better able than the State Department to make decisions based on law without being influenced by political concerns. With the passage of time, this claim can now be evaluated. In this Part, we set the stage for our empirical assessment of the FSIA's underlying comparative institutional competence claims by explaining the foreign sovereign immunity doctrine and its relationship to institutional choice, and analyzing the FSIA's legislative history to uncover the comparative institutional competence claims that provided the principal rationale for transferring the foreign sovereign immunity decisionmaking function from the executive to the judiciary.

A. Foreign Sovereign Immunity and Institutional Choice

Under the doctrine of foreign sovereign immunity, "states"--sovereign nations and their governmental organs and instrumentalities41--generally are immune from suit in the courts of other states. (42) When the doctrine emerged in the nineteenth century, the so-called "absolute theory" of foreign sovereign immunity prevailed, according to which immunity was essentially unconditional. (43) But by the mid-twentieth century, a "restrictive theory" of immunity had developed. (44) According to the restrictive theory, a state is immune against claims arising out of its public or sovereign acts {jure imperii), but not its private or commercial acts (jure gestionis). (45) Today, the restrictive approach predominates, (46) and a variety of exceptions to immunity--most prominently, the restrictive approach's commercial activity exception--are widely recognized. (47) Thus, unless an exception to immunity applies, the foreign sovereign immunity doctrine requires a state to refrain from exercising jurisdiction in a suit before its courts against another state.

Foreign sovereign immunity is a doctrine of customary international law. (48) However, because it is a doctrine of immunity from suit in domestic courts, it depends on domestic implementation. (49) In fact, the U.S. Supreme Court's (1812) decision in The Schooner Exchange v. McFaddon (50) is widely cited as the seminal statement and application of the doctrine. (51) If one state allows a suit in its courts to proceed against another state in the absence of an applicable exception from immunity, the defendant state may attempt to pursue an international legal claim against the forum state for violation of the international legal principle of foreign sovereign immunity. (52) But the day-to-day implementation of the doctrine occurs domestically in the states where other states are sued.

This raises a fundamental institutional question: which institution of a state's government should be in charge of implementing the foreign sovereign immunity doctrine? That is, which branch should examine particular cases to determine whether the general rule of immunity applies (requiring dismissal of the suit) or whether an exception to immunity applies (allowing the suit to proceed)? In the United States, the answer to this question has changed over time. (53) In the nineteenth century and early twentieth century, both the executive branch and the courts played a role in foreign sovereign immunity decisionmaking. (54) During this period, "although courts gave some weight to the executive branch's views about whether to grant sovereign immunity, the courts ultimately made their own determinations." (55)

B. Foreign Sovereign Immunity and the State Department

Later in the twentieth century, the State Department took the lead in foreign sovereign immunity decisionmaking. In the 1930s, the courts increasingly deferred to the State Department's immunity determinations. (56) In its 1943 decision in Ex parte Republic of Peru, the U.S. Supreme Court explicitly held that the judicial branch was bound to follow the executive branch's suggestions of immunity. (57) Additionally, in its 1945 decision in Republic of Mexico v. Hoffman, the Supreme Court reiterated the rule of deference and further held that, in the absence of State Department guidance in specific cases, the courts must still follow principles of immunity accepted by the State Department--even if those principles diverge from customary international law principles of immunity as discerned by the courts. (58)

Meanwhile, the State Department refined its approach to foreign sovereign immunity decisionmaking both substantively and procedurally. Substantively, the State Department officially adopted the "restrictive theory" of sovereign immunity in a 1952 letter to the Acting Attorney General from the Acting Legal Adviser to the U.S. State Department, Jack Tate (the "Tate Letter"). (59) According to the restrictive theory, "the immunity of the sovereign is recognized with regard to sovereign or public acts (jure imperii) of a state, but not with respect to private acts (jure gestionis)." (60) In other words, states should enjoy immunity from suits arising out of the exercise of their governmental functions, but not from suits arising out of the types of activities in which private parties engage.

Procedurally, the State Department increasingly formalized its process for foreign sovereign immunity decisionmaking. It began by requiring a formal diplomatic request from the embassy of the foreign state seeking immunity. (61) The Department based its immunity decisions "on either representations of the embassy concerned, copies of pleadings filed with the court, or reports from the Department of Justice." (62) By the late 1960 s, the Department introduced opportunities for both litigants to submit written memoranda supporting their positions, and also to make oral presentations on the immunity issue, albeit "as informal conferences and not as on-the-record administrative proceedings." (63) If the State Department then decided that immunity should be granted, it would ask the Justice Department to file a "suggestion of immunity" with the court. (64)

Despite these refinements, the State Department's performance of the foreign sovereign immunity decisionmaking function presented two serious concerns. First, the State Department itself complained that being in charge of that function created foreign relations problems. For example, foreign states sued in U.S. courts exerted pressure on the State Department to suggest immunity, while denials of immunity sometimes resulted in negative diplomatic repercussions. (65) As one State Department Legal Adviser explained,

> State Department involvement [in foreign sovereign immunity
> decisionmaking] can be detrimental because some foreign states may
> be led to believe that since the decision can be made by the
> executive branch it should be strongly affected by foreign policy
> considerations. Consequently, foreign states are sometimes inclined
> to regard a decision by the State Department refusing to suggest
> immunity as a political decision unfavorable to them rather than a
> legal decision. (66)

Second, State Department immunity decisionmaking was perceived to be politicized and inconsistent. (67) As noted at the hearings on the FSIA, the State Department sometimes "granted immunity in cases involving unquestionably commercial transactions [for which immunity should have been denied]." (68) It was also noted that

> [t]here is always the risk, which is an unfair one for private
> litigants to run, that the Department will reach a decision to
> suggest immunity in order to achieve some foreign policy objective

```
during what might be a period of delicate diplomatic negotiations
with that particular foreign government. (69)
```

One study published shortly before the FSIA's adoption noted the probability that "diplomatic and political considerations were deemed to be of overriding importance," (70) which the executive branch conceded to be a problem. (71) Simply put, the concern was that immunity decisions--and, from a claimant's perspective, court access decisions--were being decided based on political, rather than legal considerations. (72)

C. Foreign Sovereign Immunity and the Courts

It was against this background that Congress enacted the FSIA in 1976. (73) Legally, the FSIA codified the restrictive theory of foreign sovereign immunity adopted in the Tate Letter, including an exception for certain suits based upon the commercial activity of a foreign state. (74) In terms of institutional choice, the FSIA transferred the foreign sovereign immunity decisionmaking function away from the State Department and vested it exclusively in the courts. Under the FSIA, "[c]laims of foreign states to immunity should henceforth be decided by courts of the United States and of the States." (75)

By transferring the immunity decisionmaking function to the courts, the FSIA promised to rectify the problem of politicization of immunity decisions. (76) As the House Report on the FSIA put it,

```
[a] principal purpose of this bill is to transfer the determination
of sovereign immunity from the executive branch to the judicial
branch, thereby reducing the foreign policy implications of
immunity determinations and assuring litigants that these often
crucial decisions are made on purely legal grounds and under
procedures that insure due process. (77)
```

This rationale for the transfer is made clear in the FSIA's legislative history. As stated in Department of Justice testimony in support of the FSIA, "the bill is designed to depoliticize the area of sovereign immunity by placing the responsibility for determining questions of immunity in the courts." (78) According to State Department testimony, transferring the foreign sovereign immunity decisionmaking function to the courts would "insure that sovereign immunity questions are decided on legal grounds." (79)

The private bar's support for the FSIA was based largely on the promise of depoliticizing immunity decisionmaking by transferring the function to the courts. As one prominent practitioner testified, "[t]he net effect of this bill will be to depoliticize the treatment of legal questions that properly belong exclusively in a judicial forum." (80) According to another, the transfer to the courts would ensure that litigants "would be able to rely upon the resolution of immunity questions in commercial cases by courts free from diplomatic or political influence." (81)

The State Department, on the other hand, was said to be institutionally ill-suited to make immunity decisions based on legal rather than political considerations. According to the House Report, the State Department was "in the awkward position of a political institution trying to apply a legal standard to litigation already before the courts. Moreover, it does not have the machinery to take evidence, to hear witnesses, or to afford appellate review." (82) As Monroe Leigh wrote shortly before becoming the Legal Adviser to the State Department, "there is [a] fundamental question whether it is reasonable to expect the Executive Branch to exercise the juridical function of applying the law of sovereign immunity free from the distorting effect of political considerations." (83) The House Report asserted that transferring the authority to make these decisions to the courts would "assur[e] litigants that [they] are made on purely legal grounds." (84) Testimony in support of the FSIA emphasized the importance of immunity decisionmaking of "impartial and disinterested character" and argued that this "can only be assured by open judicial determination of that issue." (85)

A second, less explicitly articulated, comparative institutional competence claim underlying the passage of the FSIA was that transferring immunity decisionmaking authority to the judiciary would increase access to U.S. courts for private litigants in suits against foreign sovereigns. The House Report noted that provisions of the FSIA would "insure that private persons have adequate means for commencing a suit against a foreign state to seek redress in the courts." (86) Similarly, State Department Legal Adviser Monroe Leigh testified that one purpose of the FSIA is "[t]o assure that American citizens are not deprived of normal legal redress against foreign states who engage in ordinary commercial transactions" and "to facilitate ... litigation against foreign states." (87)

In summary, the FSIA's proposed solution to the problem of the politicization of immunity decisionmaking was based on a fundamental--yet untested--comparative institutional competence claim: the courts are better equipped to make foreign

sovereign immunity decisions than the State Department, and, in particular, better equipped to ground their decisions in legal, rather than political, considerations. The House Report makes this claim explicitly, stating that the FSIA's "central premise" is that "decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which incorporates standards recognized under international law." (88) A second underlying claim was that transferring immunity decisionmaking authority to the judiciary would facilitate suits against foreign sovereigns.

II. EVALUATING THE CLAIMS: AN EMPIRICAL STRATEGY

It has now been almost forty years since the adoption of the FSIA and its transfer of the foreign sovereign immunity decisionmaking function from the State Department to the judiciary. Thus, it is now possible to evaluate the FSIA's underlying comparative institutional competence claims. Are the courts better able than the State Department to make decisions based on law without being influenced by political factors? Were the State Department's decisions influenced by political rather than legal factors, as assumed in the FSIA's legislative history? After the FSIA, have the courts based their decisions on legal rather than political considerations, as the FSIA promised? Are there other systematic differences between immunity decisionmaking in the State Department and in the courts? In particular, do litigants have improved opportunities to pursue claims against foreign sovereigns in U.S. courts? The answers to these questions are relevant to analyzing the FSIA and, more broadly, provide insights about the appropriate roles of the executive and judicial branches in foreign relations.

In this Part, we present our empirical strategy for shedding light on these questions. As explained in detail below, we began by identifying hundreds of foreign sovereign immunity decisions made by the State Department before the FSIA was passed, and subsequently by the U.S. district courts after the enactment of the FSIA. We then carefully analyzed each decision and coded it to indicate whether or not it resulted in a grant of immunity. We also coded these decisions using data to measure a wide range of legal and political factors that potentially influenced them.

The result was an extensive dataset of foreign sovereign immunity decisions--the FSI Dataset. Using statistical methods, we then used the FSI Dataset to evaluate the FSIA's underlying comparative institutional competence claims. This strategy cannot uncover all differences between the two institutions' immunity decisions, but it does allow us to provide systematic empirical evidence on the FSIA's underlying comparative institutional competence claims and on the competence of the executive and judicial branches in foreign relations more generally.

A. Building the Foreign Sovereign Immunity Dataset

Our first step was to assemble the considerable amount of data needed for our analysis. The result was an original dataset that contains detailed information about foreign sovereign immunity decisions made by both the State Department and the U.S. district courts.

1. State Department Decisions

The FSI Dataset includes information about 118 requests for immunity that the State Department received from 1952 (the year of the Tate Letter) to 1977 (the year the FSIA became effective). Our primary source of information about these requests is an appendix to the 1977 edition of the State Department's Digest of U.S. Practice of International Law, entitled Sovereign Immunity Decisions of the Department of State, May 1952 to January 1977 (hereinafter State Department Report). (89) Although the editors of the State Department Report do not guarantee that it includes every immunity decision made by the State Department, they explain that it includes "all diplomatic requests for sovereign immunity, and Department decisions in response to those requests, that could be gleaned from a search of Department of State and Department of Justice files." (90) Thus, while it is possible that the State Department Report does not contain all of the State Department's immunity decisions from that period, it is the most comprehensive source available. (91)

2. U.S. District Court Decisions

The FSI Dataset also includes 381 randomly selected U.S. district court opinions from the Lexis online database in which courts decided whether to grant immunity under the FSIA. (92) The decisions available in Lexis include all decisions published in the Federal Supplement and many, but not all, decisions that are not. It is well known that published decisions are not necessarily representative of unpublished decisions (93) and that electronic databases such as Lexis tend to be overpopulated with published decisions. (94) In Section III.D., we analyze whether this tendency poses a threat to the inferences we draw from this sample of decisions, and conclude that it is unlikely to affect our central findings. (95)

B. Coding Decisions and Measuring Legal and Political Influences

We coded each foreign sovereign immunity decision in the FSI Dataset to create variables that both describe the outcome of the immunity decision and test for a wide range of legal and political factors that can potentially influence these decisions. (96)

1. Decision

To indicate the outcome of each decision, we created the variable, Decision. We coded it as 1 ("Yes") if the decisionmaker (either the State Department or the U.S. district court) granted immunity and 0 ("No") if the decisionmaker did not grant immunity.

In thirty cases it reviewed, the State Department either took no action in response to a request for immunity or the request was withdrawn prior to any State Department action. (97) These cases are difficult to classify: on the one hand, the State Department did not grant immunity; but on the other hand, immunity was not formally denied. Out of caution, we took two different approaches to these cases. First, we performed our analyses without these thirty cases. These are the analyses we generally report. Second, we repeated our analyses with these thirty cases included and Decision coded as 0 ("No" since the State Department did not grant immunity). Generally, the results were similar, and we report them where they differed significantly.

2. Potential Legal Influences on Immunity Decisions

We also created variables to test for potential legal influences on foreign sovereign immunity decisionmaking. (98) While one might not necessarily expect the State Department's decisions to be based primarily on legal factors, (99) one might be tempted to take for granted that legal influences exert a dominant force on the courts' immunity decisions. Indeed, the FSLA's legislative history suggests that this was taken for granted by the FSIA's supporters. (100) But there is a well-established line of interdisciplinary scholarship on judicial decisionmaking. Although there is great debate over what factors influence judicial decisionmaking, much of this scholarship has suggested that politics, not law, dominates judicial decisionmaking. (101) At least one legal scholar has argued that political considerations enter into the courts' foreign sovereign immunity decisions. (102) Therefore, we investigate rather than assume potential legal influences. Specifically, we investigate two legal factors that potentially influence foreign sovereign immunity decisions: whether the plaintiff's claim is based upon the foreign state's commercial activity and whether that activity has connections to the territory of the United States.

a. Commercial Activity

We measure the first factor--whether the plaintiff's claim is based upon the foreign state's commercial activity--because it is necessary to trigger the commercial activity exception, which is the principal exception to foreign sovereign immunity and the hallmark of the restrictive theory embodied in the Tate Letter and the FSIA. (103) Therefore, if legal factors influence foreign sovereign immunity decisionmaking, we would expect commercial activity to be among those factors.

To measure commercial activity, we created two variables. First, we created the variable Corporate Defendant and coded it as 1 ("Yes") if the foreign state defendant was a corporate business entity and 0 ("No") otherwise. This measure is imperfect insofar as a plaintiff's suit against a corporate defendant will not always necessarily arise out of that defendant's commercial activity, However, this is unlikely to be the case with much frequency since corporate business entities ordinarily engage in commercial activity.

For analysis of court decisions, we also created the variable Commercial Activity and coded it as 1 ("Yes") if the plaintiffs claim was based on the foreign state's purchase or sale of goods or services, or its investment or other financial activity (such as issuing or purchasing debt or equity securities, lending or borrowing money, or guaranteeing debt obligations). Otherwise, we coded Commercial Activity as 0 ("No"). (104) Of course, the variable does not necessarily capture all activity that could conceivably be classified as commercial in nature. However, it is designed to capture most forms of commercial activity. (105) Due to lack of information in the State Department Reports, we were unable to code this variable for the State Department cases. Therefore, while the Commercial Activity variable is more precise, the Corporate Defendant variable offers a consistent measure across the pre-FSIA and post-FSIA periods.

b. Territorial Connections

Another legal factor that potentially influences foreign sovereign immunity decisions--at least in the post-FSIA period--is the connection between U.S. territory and the activity of the foreign state giving rise to the plaintiff's claim. Most (but not all) exceptions to immunity under the FSIA require some territorial connection, including the commercial activity exception, which requires an "activity carried on in the United States by the foreign state," "an act performed in the United States," or an act that "causes a direct effect in the United States." (106) Other FSIA exceptions also require a territorial connection. (107)

To measure territorial connections to the United States, we created the variable U.S. Contacts and, for each decision in the dataset, we coded it as 1 ("Yes") if the conduct or injury at issue occurred entirely or partially on U.S. territory, and 0 ("No") if the conduct and injury occurred purely outside U.S. territory. (108)

3. Potential Political Influences on Immunity Decisions

The concerns expressed in the FSIA's legislative history about the politicization of the State Department's foreign sovereign immunity decisions focused on a particular class of political factors: factors related to U.S. relations with the foreign state

seeking immunity that might lead a U.S. decisionmaker to grant (or withhold) immunity even if the law of foreign sovereign immunity would indicate otherwise. (109) Supporters of the FSIA made the comparative institutional competence claim that while such factors influenced the State Department's immunity decisions, they would not influence the courts' decisions. (110)

To shed empirical light on the validity of this claim, we created variables to measure five types of potential political influences: (a) the foreign state's formal relationship with the United States; (b) the foreign state's political importance to the United States; (c) the foreign state's economic power; (d) the foreign state's military power; and (e) the foreign state's political system. In addition, we created two additional variables to measure potential political influences rooted in the decisionmaker, rather than the foreign state: (f) the U.S. decisionmaker's ideological preferences and (g) the nationality of the plaintiff. (111)

a. Foreign State's Formal Relationship with the United States

For several reasons, a U.S. decisionmaker may be more likely to grant immunity to a foreign state with which the United States has a formal relationship. A formal relationship provides a channel of communication that a foreign state can use to exert diplomatic pressure on the United States. Moreover, a U.S. decisionmaker may have a sense of duty to provide the benefit of immunity to a foreign state with which the United States has a formal relationship, and may be concerned that a denial of immunity could damage that relationship. One might expect the existence of a formal relationship to be most significant in State Department decisionmaking since, as the diplomatic branch of the U.S. government, it is more likely than the courts to be the target of diplomatic pressure from foreign states and to be aware of the status and importance of U.S. relationships with particular foreign states.

To assess whether the existence of a formal relationship between the foreign state and the United States affects the likelihood that a U.S. decisionmaker will grant immunity, we created three variables:

U.S. Ally: We coded this variable as 1 ("Yes") if the country requesting immunity had a formal alliance with the United States in the year of the decision and 0 ("No") otherwise. (112) Since one of the primary justifications for the passage of the FSIA was that the State Department was making politically motivated decisions, (113) one might expect that formal allies would be more likely to receive immunity during the pre-FSIA period.

Diplomatic Representation: We coded this variable as I ("Yes") if either the United States had diplomatic representation in the foreign state or the foreign state had diplomatic representation in the United States and o ("No") otherwise. (114) If diplomatic pressure is being used to influence immunity decisions, one would expect Diplomatic Representation to have a positive effect on the probability of immunity.

Troop Deployment: We coded this variable as 1 ("Yes") if there are U.S. troops deployed in the country requesting immunity in the year of the decision, and 0 ("No") otherwise. (115) Prior research suggests that the United States must offer concessions to foreign governments in exchange for the right to station troops upon their soil. (116) As a result, one might expect that the United States would have political incentives to grant immunity to foreign governments where U.S. troops are deployed.

b. Foreign State's Political Importance

Whether a U.S. decisionmaker grants immunity to a foreign state may also depend partly on the foreign state's political importance. Regardless of the existence of a formal relationship between the United States and a foreign state, the United States may have an interest in eliciting the support or assistance of politically important foreign states to advance U.S. foreign policy. To that end, a U.S. decisionmaker may be more likely to grant immunity to politically important foreign states. Moreover, U.S. decisionmakers may be concerned that a denial of immunity may prompt a politically important foreign state to withhold support or assistance. We created three variables to measure political importance:

UNSC Member: We coded this variable as 1 ("Yes") if the foreign state was a member of the United Nations Security Council (UNSC) in the year of decision, and 0 ("No") otherwise. (117) Prior research suggests that major powers increase aid to states that become members of the Security Council to influence their votes and obtain their support on matters before the Council. (118) It is thus quite possible that keeping a Security Council member happy is exactly the kind of political consideration that would lead the State Department to grant immunity to a foreign state. Therefore, at least in the pre-FSIA period, one might expect UNSC Member to have a positive effect on the probability of immunity.

Communist Border: We coded this variable as I ("Yes") if the country requesting immunity shared a land border with a Communist state in the decision year, and 0 ("No") otherwise. (119) During the Cold War, a goal of U.S. foreign policy was containing Communism. As a result, states that shared a border with Communist countries were more likely to receive assistance from the United States. (120) Since these states may be more likely to receive grants of immunity, we coded this variable for all requests received in 1991 or earlier.

Communist State: We coded this variable as 1 ("Yes") if the country requesting immunity was a Communist country in the

year that it requested immunity, and as 0 ("No") otherwise. (121) Given the political salience of communism during the Cold War, we have included this variable to assess whether being a Communist state influenced the likelihood of immunity.

c. Foreign State's Economic Power

The likelihood of immunity may also depend on the foreign state's economic power. A U.S. decisionmaker may grant immunity to attract or preserve economic benefits from a foreign state, and may be concerned that a denial of immunity could prompt a foreign state to withhold those benefits. The more economically powerful a foreign state, the more heavily these considerations are likely to weigh in favor of granting immunity. We created three variables to measure economic power:

GDP Per Capita: This variable equals the estimated per capita gross domestic product ("GDP Per Capita") for the citizens in the state requesting immunity in the decision year. (122)

U.S. Exports: This variable equals the value in millions of U.S. dollars of the goods that the United States exported to the country requesting immunity in the decision year. (123)

OECD Member: We coded this variable as 1 ("Yes") if the foreign state was a member of the Organization for Economic Cooperation and Development (OECD), which includes many of the world's most economically powerful states, in the decision year and 0 ("No") otherwise. (124)

d. Foreign State's Military Power

The United States may have an interest in fostering the support of or good relations with foreign states that have a powerful military. A U.S. decisionmaker may view a grant of immunity as one way to foster these relationships, and a denial of immunity as potentially undermining them. As a measure of the foreign state's military power, we used the variable CINC, which represents the Correlates of War Composite Index of National Capability score (CINC Score) for each country in the decision year. (125)

e. Foreign State's Political System

The foreign state's political system is another factor that may influence foreign sovereign immunity decisions. According to liberal international law theory, legal relations between two liberal democracies differ systematically from legal relations between liberal and non-liberal democracies and between two non-liberal democracies. (126) Specifically, the "courts of liberal states handle cases involving other liberal states differently from the way they handle cases involving nonliberal states." (127) Critics of liberal international law theory reject the claim that U.S. courts relate differently to liberal democracies than to other regimes. (128) Moreover, the theory does not yield clear predictions about whether a U.S. court will be more or less likely to grant immunity to a democracy or non-democracy. (129) Nevertheless, if the theory is correct, then U.S. foreign sovereign immunity decisions should depend, at least in part, on whether the foreign state is a liberal democracy.

To assess this hypothesis, we created the variable Democracy. To do so, we used the Polity IV dataset, which rates governments on a scale from -10 (most autocratic) to +10 (most democratic). (130) Following conventional practice in international relations scholarship, (131) we coded foreign states as 1 ("Yes") if they had a Polity score of 7 or higher in the decision year, and as 0 ("No") otherwise.

f. U.S. Decisionmaker's Ideological Preferences

The decisionmaker's ideological preferences are another political factor that may influence foreign sovereign immunity decisionmaking. (132) On the one hand, other things being equal, one might expect conservatives to be more likely than liberals to grant immunity. Prior scholarship suggests that conservatives have a more anti-forum shopping and "pro-defendant tilt," and may generally more strongly disfavor litigation than liberals. (133) Moreover, conservative judges may, on average, have a stronger preference for an expansive norm of sovereignty (and hence sovereign immunity) than liberals. On the other hand, foreign state immunity is an international law principle involving deference to foreign states. If conservatives are, on average, less supportive of international law and less likely to defer to foreign interests than liberals, they may be less likely than liberals to grant immunity to foreign states. (134)

To assess this hypothesis, we created two variables. First, we created the variable Decisionmaker's Party and coded it as 1 ("Republican") if the State Department was the decisionmaker and the President in the year of the decision was Republican. (135) We also coded this variable as 1 if the decisionmaker was a judge nominated by a Republican president. (136) Otherwise, we coded Decisionmaker's Party as 0 ("Democrat").

Second, for post-FSIA decisions only, we used the variable Judicial Common Space, which equals the Judicial Common Space score for the judge. (137) The score ranges from -l (most liberal) to +1 (most conservative).138 The Judicial Common Space score is "the state-of-the-art measure" of the ideological preferences of U.S. district court judges. (139) However, the

Judicial Common Space measure, like the party of the nominating president, may underestimate the impact of judicial ideology. (140) Therefore, our results are "best interpreted as providing only a lower bound on [the impact of] ideology." (141)

g. Nationality of the Plaintiff

Finally, the nationality of the plaintiff may influence foreign sovereign immunity decisions. (142) The State Department, though charged with the conduct of U.S. foreign relations, may nevertheless be less inclined to deny court access to a U.S. claimant than to a foreign claimant against a foreign State. Prior scholarship provides support for this hypothesis in judicial decisionmaking. (143) At least one study, however, suggests that foreign claimants may actually fare better in U.S. courts. (144) To assess the hypothesis that a grant of immunity is less likely when a U.S. citizen is a plaintiff, we created the variable U.S. Plaintiff, and we coded it as 1 ("Yes") if the plaintiff is a U.S. citizen and 0 ("No") otherwise. (145)

Table 1 summarizes the variables used in our analysis, along with the sources of the data. Appendix A presents complete summary statistics.

III. EVALUATING THE CLAIMS: FINDINGS

Using the FSI Dataset described in Part II, we now present the results of our empirical assessment of the FSIA's underlying comparative institutional competence claims. First, we analyze the State Department's foreign sovereign immunity decisions to assess the claim made by the FSIA's supporters that those decisions were influenced by political more than legal factors. Contrary to that claim, we do not find evidence of systematic political influences on the State Department's decisions, but we do find evidence of legal influences. Second, we analyze the U.S. district courts' decisions to assess whether, as the FSIA's legislative history promised, the courts base their immunity decisions on legal rather than political factors. We do find evidence of legal influences on the courts' decisions, but we also find evidence of systematic political influences. Third, we analyze the two institutions' decisions together to assess whether, other things being equal, the transfer from the State Department to the courts enhanced court access for litigants in suits against foreign sovereigns by reducing the likelihood of immunity. We do not find evidence of a significant change.

Overall, these findings challenge the FSIA's motivating comparative institutional competence claims. Beyond foreign sovereign immunity, these findings suggest that the executive branch may be more institutionally capable of making sound foreign relations decisions than the conventional wisdom suggests, and that merely transferring foreign relations decisions to the judiciary does not ensure that those decisions will be free from political influences.

A. Before the FSIA: Factors Influencing the State Department's Foreign Sovereign Immunity Decisions

To assess the extent to which legal and political factors may have systematically influenced the State Department's foreign sovereign immunity decisions, we analyze those decisions using two statistical methods: simple bivariate logit regression analysis and multiple logit regression analysis. Logit analysis is the standard social science method for estimating the effects of hypothesized influences or "independent variables" (in our case, our hypothesized legal and political factors) on an outcome that has only two possible results (referred to as a "binary dependent variable"--in our case, a grant or a denial of immunity). (146) We use this method to estimate the effects of the legal and political variables discussed above on the probability that the State Department granted immunity.

Bivariate logit analysis does this while only examining a single variable (measuring the influence of a single legal or political factor,147) whereas multivariate logit analysis does this while controlling for the influence of a number of other variables (representing multiple legal and political factors). (148) Bivariate analysis can efficiently detect possible influences of individual factors on immunity decisions, while multivariate analysis can often provide a more nuanced understanding by estimating the effect of each individual factor taking into account the effects of other factors. When the results of bivariate but not multivariate analysis indicate that a particular factor has an influence (or vice versa), the evidence of influence is still important to consider but not as strong as when the results are consistent.

COPYRIGHT 2015 University of Pennsylvania, Law School
No portion of this article can be reproduced without the express written permission from the copyright holder.
Copyright 2015 Gale, Cengage Learning. All rights reserved.

**Please bookmark with social media, your votes are noticed and appreciated:**

Article Details

Case 1:22-cv-01144-RC   Document 1-13   Filed 04/26/22   Page 14 of 15

| | |
|---|---|
| | Printer friendly   Cite/link   Email   Feedback |
| Title Annotation: | Introduction into III. Evaluating the Claims: Findings A. Before the FSIA: Factors Influencing the State, p. 411-448 |
| Author: | Chilton, Adam S.; Whytock, Christopher A. |
| Publication: | University of Pennsylvania Law Review |
| Date: | Jan 1, 2015 |
| Words: | 8716 |
| Previous Article: | Big data and predictive reasonable suspicion. |
| Next Article: | Foreign sovereign immunity and comparative institutional competence. |
| Topics: | Competent authority |
| |     Comparative analysis |
| | Federal courts |
| |     Evaluation |
| | Sovereign immunity |
| |     Laws, regulations and rules |

Advertisement. Bad banner? Please let us know

The Free Library > Law/Government/Politics > Law > University of Pennsylvania Law Review > January 1, 2015
The Free Library > Date > 2015 > January > 1 > University of Pennsylvania Law Review

Publications by Name      Publications by Date        Authors                    Literature
A-D E-O P-T U-Z           before 1995 1995-1999       A B C D E F G H I J K L M  A B C D E F G H I J K L M
                          2000-2004 2005-2009 2010-   N O P Q R S T U V W X Y Z  N O P Q R S T U V W X Y Z

Terms of use | Privacy policy | Copyright © 2022 Farlex, Inc. | Feedback | For webmasters |

4/8/22, 11:35 AM
Case 1:22-cv-01144-RC Document 1-13 Filed 04/26/22 Page 15 of 15
Foreign sovereign immunity and comparative institutional competence - Free Online Library