# Exhibit J

4/8/22, 11:20 AM — Intelligible Principle Law and Legal Definition | USLegal, Inc.

Case 1:22-cv-01144-RC   Document 2-10   Filed 05/02/22   Page 2 of 47

🇺🇦  SHOW SUPPORT TO UKRAINE
DONATE (https://novaukraine.org/donate/)                    ✕

 (https://definitions.uslegal.com/)

Search All of USLegal, Inc                    Search

USLegal (https://uslegal.com/)  >  Legal Definitions (http://definitions.uslegal.com/)  >
I (http://definitions.uslegal.com/i/)  >  Intellligible Principle

# Find a legal form in minutes

Browse US Legal Forms' largest database of 85k state and industry-specific legal forms.

Select your State ⌄

Enter Search Terms

🔍 Search

Popular forms                                              Show +

# Intellligible Principle Law and Legal Definition

The Supreme Court has recognized that Congress could not delegate powers that were "strictly and exclusively legislative." Chief Justice John Marshall laid the groundwork for the "intelligible principle" standard that governs s non-delegation cases today. Marshall stated that if Congress delegates quasi-legislative powers to another body, it must provide a "general provision" by

which "those who act" can "fill up the details." Therefore, Congress cannot give an outside agency free reign to make law, but it can authorize the agency to flesh out the details of a law Congress has already put in place. This became known as providing an "intelligible principle" to which the agency is instructed to conform. The "intelligible principle" could be anything in the "public interest, convenience, or necessity" or considered "just and reasonable." Being put in such subjective terms gives agencies vast discretion when enacting new rules.

# ❯ Legal Definition list

Intelligence Reform and Terrorism Prevention Act [IRTPA] (i/intelligence-reform-and-terrorism-prevention-act-irtpa/)

Intelligence Gathering Agency (i/intelligence-gathering-agency/)

Intelligence Cycle (i/intelligence-cycle/)

Intelligence Component of the Department of Defense (i/intelligence-component-of-the-department-of-defense/)

Intelligence Community (i/intelligence-community/)

» Intellligible Principle

Intended Beneficiary (i/intended-beneficiary/)

Intended Loss (i/intended-loss/)

Intended-Use Doctrine (i/intended-use-doctrine/)

Intensive Care Newborn Nursery Services (i/intensive-care-newborn-nursery-services/)

Intensive Farming (i/intensive-farming/)

# ❯ Related Legal Terms

Accepted Analytical Principle (a/accepted-analytical-principle/)

Accounting Principles Board (a/accounting-principles-board/)

Continuous-Adverse-Use Principle (c/continuous-adverse-use-principle/)

Debtor Creditor Principle (d/debtor-creditor-principle/)

Destination Principle (d/destination-principle/)

Dominant-Jurisdiction Principle (d/dominant-jurisdiction-principle/)

Dual-Criminality Principle (d/dual-criminality-principle/)

FDI Directional Principle (f/fdi-directional-principle/)

Flotilla Principle (f/flotilla-principle/)

Fraud-on-the-Market Principle (f/fraud-on-the-market-principle/)

Attorney Help (https://lawyers.uslegal.com/)

Legal Definitions (https://definitions.uslegal.com/)

*Legal Q&A Online (https://answers.uslegal.com/)*

US Legal Forms (https://www.uslegalforms.com/)

Legal Topics (https://uslegal.com/legal-topics/)

---

🔍 Search Legal Terms

---

Share:

(https://www.addtoany.com/share#url=https%3A%2F%2Fdefinitions.uslegal.com%2Fi%2F

principle&title=Intellligible%20Principle%20Law%20and%20Legal%20Definition%20%7C%20U

(/#facebook)    (/#twitter)    (/#linkedin)

Case 1:22-cv-01144-RC Document 2-10 Filed 05/02/22 Page 5 of 47

Legal Forms

Last Will (https://www.uslegalforms.com/wills/)

Power of Attorney (https://www.uslegalforms.com/powerofattorney/)

Living Will (https://www.uslegalforms.com/livingwills/)

Adoption (https://www.uslegalforms.com/adoption/)

Affidavits (https://www.uslegalforms.com/affidavits/)

Real Estate (https://www.uslegalforms.com/realestate/)

Landlord Tenant (https://www.uslegalforms.com/landlordtenant/)

Divorce (https://www.uslegalforms.com/divorce/)

Trusts (https://www.uslegalforms.com/trusts/)

"You have an excellent service and I will be sure to pass the word."

## Legal Information ✚

Legal Topics
(https://uslegal.com/legal-topics/)

Definitions
(https://definitions.uslegal.com/)

Ask a Question
(https://answers.uslegal.com/)

Laws
(https://uslegal.com/legal-topics/)

View All
(https://uslegal.com/legal-information/)

## Products ✚

Personal Legal Forms
(https://uslegal.com/legal-forms/)

Business Legal Forms
(https://uslegal.com/business-legal-forms/)

Legal Forms
(https://www.uslegalforms.com/)

FormsPass Subscriptions
(http://www.formspass.com/)

## For Consumer ✚

Information
(https://uslegal.com/legal-information/)

Legal Forms
(https://www.uslegalforms.com/)

Get Legal Help
(https://uslegal.com/legal-help/)

View All
(https://uslegal.com/for-consumers/)

## Services ✚

Last Will
(https://www.uslegalforms.com/service/last-will-and-testament/)

Power of Attorney
(https://www.uslegalforms.com/service/power-of-attorney/)

Living Will
(https://www.uslegalforms.com/service/living-will-health-care-directive/)

Attorney Assistance
(https://uslegal.com/attorney-assistance/)

## For Business ✚

Information
(https://uslegal.com/legal-information/)

Legal Forms
(https://www.uslegalforms.com/)

Answers
(https://answers.uslegal.com/)

View All
(https://uslegal.com/for-businesses/)

## Customer Support ✚

1-877-389-0141

Terms of Service
(https://www.uslegalforms.com/terms-of-service/)

Privacy Policy
(https://www.uslegalforms.com/privacy-policy/)

Why USLegal? (https://uslegal.com/why-uslegal/)

Get Help (https://uslegal.com/legal-help/)

My Account (https://uslegal.com/login-information/)

## Our Sites ✚

US Legal Forms
(https://www.uslegalforms.com/)

USLegal (https://uslegal.com/)

Case 1:22-cv-01144-RC    Document 2-10    Filed 05/02/22    Page 7 of 47

FormsPass
(https://www.formspass.com/)

pdfFiller (https://www.pdffiller.com/)

signNow (https://www.signnow.com/)

airSlate Work Flows
(https://sitslate.com/workflows)

Sell Documents Online
(https://sellmyforms.com/)

© Copyright 1997-2022 airSlate Legal Forms, Inc.
d/b/a USLegal

As seen in:

  

  

SOCIAL MEDIA

   

(https://www.facebook.com/USLegalforms) (https://www.linkedin.com/company/uslegal) (https://twitter.com/USLegal) (https://www.youtube.com/channel/UC7DkKV1D49yQlTl0jzByngw?utm_source=facebook&utm_medium=social&utm_campaign=web_icon)

4/8/22, 11:22 AM    Overbreadth Doctrine Law and Legal Definition | USLegal, Inc.

Case 1:22-cv-01144-RC   Document 2-10   Filed 05/02/22   Page 8 of 47

🇺🇦   SHOW SUPPORT TO UKRAINE                           ✕
DONATE (https://novaukraine.org/donate/)

 (https://definitions.uslegal.com/)

Search All of USLegal, Inc            Search

USLegal (https://uslegal.com/)  ›  Legal Definitions (http://definitions.uslegal.com/)  ›
O (http://definitions.uslegal.com/o/)  ›  Overbreadth Doctrine

# Find a legal form in minutes

Browse US Legal Forms' largest database of 85k state and industry-specific legal forms.

Select your State                                              ⌄

Enter Search Terms

🔍  Search

Popular forms                                         Show  +

# Overbreadth Doctrine Law and Legal Definition

Overbreadth doctrine is a principle of judicial review that a law is invalid if it punishes constitutionally protected speech or conduct along with speech or conduct that the government may limit to further a compelling government interest. A statute that is broadly written which deters free expression can be struck down on its face because of its chilling effect even if it also prohibits acts that may legitimately be forbidden. If a statute is overbroad, the court may be able to save the statute by striking only the section that is overbroad. If the court cannot sever the statute and save the constitutional provisions, it may invalidate the entire statute.



Malamut & Associates, LLC

Unpaid
Wages?

Open

## ❯ Legal Definition list

Overall Liquidity Ratio (o/overall-liquidity-ratio/)

Overage Additional Premium (o/overage-additional-premium/)

Over-the-Road Bus Transportation (o/over-the-road-bus-transportation/)

Over-the-Road Bus Frontline Employees (o/over-the-road-bus-frontline-employees/)

Over-the-Road Bus (o/over-the-road-bus/)

» Overbreadth Doctrine

Overdraft (o/overdraft/)

Overdue Instrument (o/overdue-instrument/)

Overdue Support (o/overdue-support/)

Overfishing (o/overfishing/)

Overhead Expense (o/overhead-expense/)

## ❯ Related Legal Terms

Abrogation Doctrine (a/abrogation-doctrine/)

Abstention Doctrine (a/abstention-doctrine/)

Abuse-of-the-Writ Doctrine (a/abuse-of-the-writ-doctrine/)

Accardi Doctrine (a/accardi-doctrine/)

Acceptance Doctrine (a/acceptance-doctrine/)

Accepted Work Doctrine (a/accepted-work-doctrine/)

Acquired-Rights Doctrine (a/acquired-rights-doctrine/)

Act-of-State Doctrine (a/act-of-state-doctrine/)

Ad Coelum Doctrine (a/ad-coelum-doctrine/)

Adequate-State-Grounds Doctrine (a/adequate-state-grounds-doctrine/)

4/8/22, 11:22 AM    Overbreadth Doctrine Law and Legal Definition | USLegal, Inc.

Case 1:22-cv-01144-RC   Document 2-10   Filed 05/02/22   Page 10 of 47

Attorney Help (https://lawyers.uslegal.com/)

Legal Definitions (https://definitions.uslegal.com/)

*Legal Q&A Online (https://answers.uslegal.com/)*

US Legal Forms (https://www.uslegalforms.com/)

Legal Topics (https://uslegal.com/legal-topics/)



Malamut & Associates, LLC

Unpaid Wages?

Open

🔍 Search Legal Terms

Share:

(https://www.addtoany.com/share#url=https%3A%2F%2Fdefinitions.uslegal.com%2Fo%2F

doctrine%2F&title=Overbreadth%20Doctrine%20Law%20and%20Legal%20Definition%20%7

(/#facebook)     (/#twitter)     (/#linkedin)

4/8/22, 11:22 AM                    Overbreadth Doctrine Law and Legal Definition | USLegal, Inc.

Case 1:22-cv-01144-RC   Document 2-10   Filed 05/02/22   Page 11 of 47

Malamut & Associates, LLC



# Unpaid
# Wages?

Open

Legal Forms

Last Will (https://www.uslegalforms.com/wills/)

Power of Attorney (https://www.uslegalforms.com/powerofattorney/)

Living Will (https://www.uslegalforms.com/livingwills/)

Adoption (https://www.uslegalforms.com/adoption/)

Affidavits (https://www.uslegalforms.com/affidavits/)

Real Estate (https://www.uslegalforms.com/realestate/)

Landlord Tenant (https://www.uslegalforms.com/landlordtenant/)

Divorce (https://www.uslegalforms.com/divorce/)

Trusts (https://www.uslegalforms.com/trusts/)

---

"You have an excellent service and I will be sure to pass the word."

---

**13 Retirement Mistakes**

Ad   Fisher Investments

**Workplace Discrimination?**

Ad   Malamut & Associates, LLC

**Real Estate Attorney - New Jersey Business Attorney**

Ad   scipiolaw.com

**T A P**

Ad

**NJ Child Custody Lawyers - Recommended NJ Attorney**

Ad   pvalaw.com

**Top Birth Injury Law Firm - Millions won for Past Clients**

Ad   mersonlaw.com

**70s Star Is Much Different Now**

Ad   Thedelite.com

**P A**

Ad

4/8/22, 11:22 AM          Overbreadth Doctrine Law and Legal Definition | USLegal, Inc.

Case 1:22-cv-01144-RC    Document 2-10    Filed 05/02/22    Page 13 of 47

Legal Information ✚

Legal Topics
(https://uslegal.com/legal-
topics/)

Definitions
(https://definitions.uslegal.com/)

Ask a Question
(https://answers.uslegal.com/)

Laws
(https://uslegal.com/legal-
topics/)

View All
(https://uslegal.com/legal-
information/)

Products        ✚

For Consumer          ✚

Information
(https://uslegal.com/legal-
information/)

Legal Forms
(https://www.uslegalforms.com/)

Get Legal Help
(https://uslegal.com/legal-
help/)

View All
(https://uslegal.com/for-
consumers/)

Services          ✚

For Business          ✚

Information
(https://uslegal.com/legal-
information/)

Legal Forms
(https://www.uslegalforms.com/)

Answers
(https://answers.uslegal.com/)

View All
(https://uslegal.com/for-
businesses/)

Customer Support          ✚

1-877-389-0141

4/8/22, 11:22 AM                    Overbreadth Doctrine Law and Legal Definition | USLegal, Inc.

Case 1:22-cv-01144-RC   Document 2-10   Filed 05/02/22   Page 14 of 47

Personal Legal Forms
(https://uslegal.com/legal-
forms/)

Last Will
(https://www.uslegalforms.com/last-
will-and-testament/)

Terms of Service
(https://www.uslegalforms.com/terms-
of-service/)

Business Legal Forms
(https://uslegal.com/business-
legal-forms/)

Power of Attorney
(https://www.uslegalforms.com/power-
of-attorney/)

Privacy Policy
(https://www.uslegalforms.com/privacy-
policy/)

Legal Forms
(https://www.uslegalforms.com/)

Living Will
(https://www.uslegalforms.com/living-
will-health-care-directive/)

Why USLegal? (https://uslegal.com/why-
uslegal/)

FormsPass Subscriptions
(http://www.formspass.com/)

Attorney Assistance
(https://uslegal.com/attorney-
assistance/)

Get Help (https://uslegal.com/legal-
help/)

My Account (https://uslegal.com/login-
information/)

## Our Sites                                    **+**

US Legal Forms
(https://www.uslegalforms.com/)

USLegal (https://uslegal.com/)

FormsPass
(https://www.formspass.com/)

pdfFiller (https://www.pdffiller.com/)

signNow (https://www.signnow.com/)

airSlate Work Flows
(https://sitslate.com/workflows)

Sell Documents Online
(https://sellmyforms.com/)

© Copyright 1997-2022 airSlate Legal Forms, Inc.
d/b/a USLegal

As seen in:

  

  

SOCIAL MEDIA

   

(https://www.facebook.com/USLegalForms?ref=hl)https://www.linkedin.com/company/uslegal-forms?trk=biz-brand-tree-co-name)https://twitter.com/uslegalhttps://www.youtube.com/channel/UC7DkKV1D49yQlTl0jzByngw?
utm_source=facebook&utm_medium=social&utm_campaign=shareuslegal&utm_content=website_icon)

## St. John's Law Review

Volume 91
Number 1 *Volume 91, Spring 2017, Number 1*                    Article 7

# The Intelligible Principle: How It Briefly Lived, Why It Died, and Why It Desperately Needs Revival in Today's Administrative State

Meaghan Dunigan

Follow this and additional works at: https://scholarship.law.stjohns.edu/lawreview

This Note is brought to you for free and open access by the Journals at St. John's Law Scholarship Repository. It has been accepted for inclusion in St. John's Law Review by an authorized editor of St. John's Law Scholarship Repository. For more information, please contact selbyc@stjohns.edu.

# THE INTELLIGIBLE PRINCIPLE:  HOW IT BRIEFLY LIVED, WHY IT DIED, AND WHY IT DESPERATELY NEEDS REVIVAL IN TODAY'S ADMINISTRATIVE STATE

MEAGHAN DUNIGAN[†]

## INTRODUCTION

The nondelegation doctrine stands for the principle that the United States Constitution places limits on the kind and quantity of discretion that Congress can grant to other government actors.  For the last century, the nondelegation doctrine has rarely been invoked to strike down congressional delegation of legislative authority, as the United States Supreme Court has repeatedly deferred to Congress and administrative agencies instead of upholding constitutional principles.[1]  The current standard of review for nondelegation cases is the "intelligible principle," first articulated by the Supreme Court in *J.W. Hampton, Jr., & Co. v. United States*.[2]  This standard mandates that so long as Congress sets forth an "intelligible principle to which the person or body authorized . . . is directed to conform, such legislative action is not a forbidden delegation of legislative power."[3]  While the intelligible principle was initially established as a means of upholding the constitutional roots of nondelegation, decades of caselaw prove that this standard has become a veiled attempt by the Supreme Court to uphold congressional delegation not because it is consistent with constitutional principles, but because the alternative—striking

---

[†] J.D. Candidate, 2017, St. John's University School of Law. Special thanks to my dad, Byran Dunigan, for instilling in me a love of this Nation's history and a passion for justice.

[1] *See infra* Section III.C. Only twice in the last century has the Supreme Court struck down congressional delegation of power using the nondelegation doctrine, both in the same year. *See* Panama Refining Co. v. Ryan, 293 U.S. 388 (1935); A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935).

[2] 276 U.S. 394 (1928).

[3] *Id.* at 409.

247

*ST. JOHN'S LAW REVIEW* [Vol. 91:247

down delegation—is not a viable option given the size and scope of today's government, most notably the growth of administrative agencies which have largely assumed the role of legislators.[4]

This Note addresses the flaws in the current intelligible principle standard and proposes a new three-part standard that would better revitalize the intelligible principle as it was first articulated almost a century ago. This Note concedes that while legislative delegation in any form is a violation of the original meaning of the nondelegation doctrine,[5] our society and the growth of administrative agencies removed any chance of having our laws created solely by Congress.[6] What can happen, and what this Note proposes, is for the Supreme Court to adopt a new intelligible principle standard that scales back the amount of authority being placed in the hands of those outside Capitol Hill.

Part I of this Note discusses the origins of congressional delegation and the constitutional principles that underlie the nondelegation doctrine. Part II discusses the creation of the intelligible principle, from its inception in *J.W. Hampton* to subsequent cases in the 1930's that defined the standard's limits. Part III discusses the breakdown of the intelligible principle, from the growth of administrative agencies to three significant mistakes made by the Supreme Court that have effectively rendered the standard meaningless. Finally, Part IV proposes a new three-part intelligible principle standard; a standard that recovers the original purpose of the nondelegation doctrine while also adapting to the immense changes that our government structure has undergone since the doctrine's inception over 225 years ago.

## I. THE ROOTS OF NONDELEGATION

The Vesting Clause of the United States Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."[7] While the meaning of "legislative power" has been the subject of scholarly debate,[8] its

---

[4]  *See infra* Part III.

[5]  *See infra* Part I.

[6]  *See infra* note 96.

[7]  U.S. CONST. art. I, § 1.

[8]  Scholars Eric A. Posner and Adrian Vermeule argue that the legislative power referred to in the Article I Vesting Clause is the ability of legislators to vote for laws.

general understanding comes from the father of the Federalist Papers, Alexander Hamilton.[9]   Hamilton defined legislative power as the power of making laws, or the right "to prescribe rules for the regulation of society."[10]   Based on this understanding, the Article I Vesting Clause places the sole authority of lawmaking in the hands of Congress; as a consequence, the nondelegation doctrine holds Congress may not delegate its lawmaking authority to any other branch.   While rooted in the Vesting Clause, the importance of the nondelegation doctrine stems from two essential principles that have stood as constitutional underpinnings—the accountability of Congress to the people and the separation of powers doctrine.

### A.   The Principles of Nondelegation

One of the most important functions of the nondelgation doctrine is to maintain the accountability of the legislative branch.[11]  This principle is perhaps best articulated in the *Second Treatise of Government*, written by the seventeenth century English philosopher John Locke.[12]  Locke believed the legislature is "the supreme power" and that "no other person or organisation . . . can make edicts that have the force of law . . . unless they have been permitted to do this by the legislature that the public has chosen and appointed."[13] Recognizing that the legislature derived its power from the people, Locke believed there were four important things a legislature could *not* do.[14]   Most notably, Locke believed the

---

As they see it, the nondelegation doctrine means that "[n]either Congress nor its members may delegate to anyone else the authority to vote on federal statutes or to exercise other de jure powers of federal legislators." Eric A. Posner & Adrian Vermeule, *Interring the Nondelegation Doctrine*, 69 U. CHI. L. REV. 1721, 1723 (2002).

[9]  *See* THE FEDERALIST NOS. 33, 75 (Alexander Hamilton).

[10]  THE FEDERALIST NO. 75, at 450 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[11]  Justice Harlan saw the importance in accountability to the people as a primary goal of nondelegation, writing that "it insures that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people." Arizona v. California, 373 U.S. 546, 626 (1963) (Harlan, J., dissenting in part).

[12]  JOHN LOCKE, THE SECOND TREATISE OF GOVERNMENT (Jonathan Bennett ed., 2008) (1689).

[13]  *Id.* at 134.

[14]  *Id.* at 135. The first limit was that the legislature cannot have arbitrary power over the lives and fortunes of the people, but instead the rules they create

legislature should not have the "power to transfer to anyone else their authority to make laws."[15]  Locke stressed the importance of the derivative power of legislative authority, believing that if the legislature were to give its lawmaking power to those outside the legislature, it would move from a body that creates laws to one that creates legislators.[16]  He proclaimed that if lawmaking authority fell into the hands of those not elected by the people, the legislature would not be held directly accountable for the laws created.  Therefore, if such laws were not well received by the public, the legislature could simply pass the blame onto the delegated parties.  Locke felt that this type of delegation would undermine the legislature's function as the voice of the people and destroy any accountability at the hands of the elected officials.  Heavily influenced by Locke's understanding of government, the United States Constitution's nondelegation doctrine was intended to defend against this breakdown of legislative accountability.

The second key principle of the nondelegation doctrine is to uphold the separation of powers doctrine implicit in the United States Constitution.[17]  James Madison stressed the importance of the separation of powers doctrine, writing that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many . . . may justly be pronounced the very definition of tyranny."[18]  If members of the executive or judicial branch were allowed to take an active role in lawmaking, it would raise questions about whether the branches were intermingling in a way that jeopardizes the separation of powers.  The nondelegation doctrine was designed to protect against this intermingling by prohibiting the

---

must conform to the laws of nature. *Id.* Second, the legislature cannot give itself power to rule by sudden, arbitrary decrees, but instead it must govern according to standing laws. *Id.* at 136. Third, the legislature cannot take any part of a man's property without his consent. *Id.* at 138.

[15] *Id.* at 141.

[16] *Id.*

[17] The Constitution contains no provision expressly calling for the separation of powers between the legislative, executive, and judicial branches. However, the Constitution has long been held to require the separation of powers as vital to maintaining governmental order.

[18] THE FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961).

delegation of legislative authority, thereby ensuring that the federal government would be unable to consolidate its power to the detriment of its citizens.

## B.   The Importance of Nondelegation

The principles of the nondelegation doctrine are vital not only to upholding the Constitution, but also to ensuring that our government functions as the republic the Nation's forefather's intended.[19] However, for decades, opponents of the doctrine have argued that nondelegation simply is not a viable option in today's society.[20] Some scholars argue that the nondelegation doctrine has been misinterpreted from its inception, and that the delegation of legislative authority is actually consistent with the Constitution.[21] Others argue that while the doctrine exists, its revival would have no effect on improving the current administrative state.[22]

This Note does not debate the merits of the nondelegation doctrine. Instead, this Note accepts that the nondelegation doctrine exists, and that the principles justifying it are essential to upholding the values of the Constitution. However, what this Note does seek to do is shed light on the deficiencies in the current nondelegation standard. The United States Supreme Court has increasingly allowed an intermingling of power between the legislative and executive branch, which has undermined both the principles of accountability and separation of powers that nondelegation was designed to protect. As a result, the nondelegation doctrine stands as an unenforceable

---

[19] *See* THE FEDERALIST NO. 10, at 82 (James Madison) (Clinton Rossiter ed., 1961) (describing the difference between a republic and a democracy and how the United States is a republic, which Madison defined as "the delegation of government . . . to a small number of citizens elected by the rest").

[20] *See* Richard B. Stewart, *The Reformation of American Administrative Law*, 88 HARV. L. REV. 1669, 1694–97 (1975) (arguing that stricter enforcement of the nondelegation doctrine would "clearly be unwise" because calling for more detailed legislative specification of policies is "neither feasible nor desirable"); David B. Spence & Frank Cross, *A Public Choice Case for the Administrative State*, 89 GEO. L.J. 97 (2000) (arguing why public choice would support delegating legislative authority to unelected agency officials).

[21] *See* Posner & Vermeule, *supra* note 8, at 1723–25.

[22] *See* Cass R. Sunstein, *Nondelegation Canons*, 67 U. CHI. L. REV. 315, 321 (2000) ("[I]t is far from clear that a large-scale judicial revival of the nondelegation doctrine would do anything to improve the operation of the regulatory state. It may well make things worse, possibly much worse.").

doctrine, as the current intelligible principle standard is a hollowed shell compared to its original inception. This Note proposes a reformulation of the intelligible principle that both upholds constitutional principles and ensures society can operate given today's complex government structure.

## II. THE CREATION OF THE INTELLIGIBLE PRINCIPLE

While the principles of nondelegation are rooted in ideals that form the foundation of our republic, the unfortunate truth is that the nondelegation doctrine began crumbling within two decades of the ratification of the United States Constitution. As a result, the intelligible principle was adopted to enforce the decaying doctrine by ensuring that Congress was not delegating its legislative authority in a manner inconsistent with the Constitution. However, over the past eighty years, the intelligible principle has become a meaningless phrase used by the United States Supreme Court to justify the delegation of virtually unrestricted legislative authority to administrative agencies. Consequently, the current intelligible principle standard is riddled with gaps that must be filled. In order to fill these gaps, the first step is to trace how nondelegation took its current shape.

### A. Conditional Legislation

The Supreme Court's first nondelegation case was *Cargo of Brig Aurora v. United States*,[23] decided in 1813. After the expiration of the Non-Intercourse Act of 1809, Congress passed an updated version of the Act in 1811 that restricted trade with France and Great Britain.[24] The statute gave the President authority to lift the trade embargo against either country if he declared that the country had stopped violating the neutral trading power of the United States.[25] Challenged for giving the President a role in the legislative process, the Court held that this type of delegation to the President was permissible since it was Congress, not the President, who actually created the law.[26] The President's role was simply to make the factual

---

[23] 11 U.S. 382 (1813).
[24] *Id.* at 388.
[25] *Id.* at 383.
[26] *Id.* at 386.

2017]

determination as to whether the law would go into effect. Known as "conditional legislation,"[27] this type of delegation became the first standard by which nondelegation was measured.

In terms of upholding the principles of the nondelegation doctrine, conditional legislation fell in line with keeping accountability in the hands of Congress and maintaining the separation of powers between Congress and the Executive.[28] The Court elaborated on conditional legislation as a means of congressional delegation in 1892, when it decided *Marshall Field & Co. v. Clark*.[29] In *Field*, Congress passed the Tariff Act of 1890, known today as the McKinley Tariff, which authorized the President to suspend those provisions of the Tariff Act that permitted the free importation of goods if the President determined that a country imposed duties that were "reciprocally unequal and unreasonable."[30] Among other things, the Act was challenged as granting the President impermissible legislative authority.[31] Writing for the Court, Justice Harlan stated:

> The true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.[32]

The Court held that the Act was a permissible delegation of authority to the President.[33] The Court reasoned that "[l]egislative power was exercised when congress declared that the suspension should take effect upon a named contingency," and that the President "was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect."[34] The Court's holding, combined with Justice Harlan's examination into what

---

[27] Also referred to as the "named contingency" test. *See* WILLIAM F. FUNK, SIDNEY A. SHAPIRO & RUSSELL L. WEAVER, ADMINISTRATIVE PROCEDURE AND PRACTICE: PROBLEMS AND CASES 546–47 (5th ed. 2014).

[28] See Justice Clarence Thomas' concurring opinion in *Department of Transportation v. Association of American Railroads*, *infra* Section IV.B.

[29] 143 U.S. 649 (1892).

[30] *Id.* at 680.

[31] *Id.* at 681.

[32] *Id.* at 693–94 (quoting Cincinnati, Wilmington & Zanesville R.R. Co. v. Comm'rs of Clinton Cty., 1 Ohio St. 77, 88–89 (1852)).

[33] *Id.* at 690–91.

[34] *Id.* at 693.

constitutes a permissible delegation, shows that the only permissible authority Congress may grant the Executive is in the form of conditional legislation, and not the delegation of pure lawmaking.

While there is an argument to be made that the *Field* Court extended conditional legislation beyond what the Court in *Brig Aurora* had intended,[35] *Field* remained outside the realm of delegating pure legislative authority to the executive. Nevertheless, heading into the twentieth century, the nature of government was changing, beginning with the Interstate Commerce Act of 1887[36] and the growth of the administrative state under the New Deal.[37] With the creation of agencies and commissions that fell under the executive branch, Congress began delegating more authority that pushed beyond conditional legislation, paving the way for the Court to establish the intelligible principle as the new standard to measure congressional delegation.

## B. *Birth of the Intelligible Principle*

The intelligible principle was first articulated in *J.W. Hampton, Jr., & Co. v. United States*,[38] opening the door to a new era of nondelegation jurisprudence. *J.W. Hampton* involved a challenge to the so-called "flexible tariff provision" within the Tariff Act of 1922.[39] The provision authorized the President to fix certain rates of goods if the President determined that the current rates did not equal the difference between the cost of production in the United States and foreign countries.[40] To make that determination, Congress laid out four considerations[41] that

---

[35] Unlike in *Brig Aurora*, which only authorized the President to determine whether or not France or Great Britain stopped violating the neutral trading power of the United States, the statute in *Field* was more discretionary because it allowed the President to determine whether the duties levied by other countries were "unequal and unreasonable." This difference, though minor, is an important step to understanding the current scope of congressional delegation and the intelligible principle. *See also* Gary Lawson, *Delegation and Original Meaning*, 88 VA. L. REV. 327, 362–65 (2002).

[36] *See* David Casazza, Note, *Liberty Requires Accountability: Checking Delegations to Independent Agencies*, 38 HARV. J.L. & PUB. POL'Y 729, 737 (2015).

[37] *See infra* Part III, notes 71–72 and accompanying text.

[38] 276 U.S. 394 (1928).

[39] *Id.* at 400.

[40] *Id.* at 400–01.

[41] The four considerations were:

the President would use, and also mandated that the United States Tariff Commission conduct an investigation before any proclamation could be issued.[42]

J.W. Hampton, Jr., & Co challenged this provision, arguing that it was an invalid delegation of legislative authority to the President.[43]  The United States. Supreme Court, in a unanimous decision, held that the flexible tariff provision was a permissible delegation of authority to the President.[44]  The Court found that Congress had clearly defined a policy and plan, and the authority given to the President was merely to determine differences in rates to comply with that underlying policy and plan.[45]  The Court did not view the President's authority as an exercise of delegation of legislative power.  Instead, the Court viewed the President's authority as a means "to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution . . . ."[46]  Based on this analysis, Justice Taft concluded that "[i]f Congress shall lay down by legislative act an intelligible principle to which the person or body authorized [to act] is directed to conform, such legislative action is not a forbidden delegation of legislative power."[47]

Based on the Court's rationale, the intelligible principle requires Congress to clearly articulate a "policy and plan" and allows Congress to grant the executive the authority to execute that plan upon consideration of various factors.   While theoretically the intelligible principle seems to align with conditional legislation because it empowers the executive to

---

(1) the differences in conditions in production, including wages, costs of material, and other items in costs of production of such or similar articles in the United States and in competing foreign countries; (2) the differences in the wholesale selling prices of domestic and foreign articles in the principal markets of the United States; (3) advantages granted to a foreign producer by a foreign government, or by a person, partnership, corporation, or association in a foreign country;  and  (4) any other advantages or disadvantages in competition.
*Id.* at 401–02.
   [42] *Id.* at 402.
   [43] *Id.* at 404.
   [44] *Id.* at 410–11.
   [45] *Id.* at 404–05.
   [46] *Id.* at 406.
   [47] *Id.* at 409.

implement a plan already established by Congress; in reality, the intelligible principle, as it was first articulated, actually permitted Congress to delegate purely legislative power.[48] Unlike in *Field*, where the President was only making a factual determination as to whether certain goods should have rates that were already prescribed by Congress, in *J.W. Hampton*, the President was not only determining whether current rates were unequal, but also what those rates should be.[49] While the Court itself maintained that the President's action was the mere execution of an existing statute, the Court went on to state that "[i]f Congress were to be required to fix every rate, it would be impossible to exercise the power at all."[50] This suggests that, for practical reasons, the Court will allow Congress to delegate legislative authority to the executive. Therefore, the main purpose in establishing the intelligible principle was to ensure that such delegation was not too excessive.

## C.   *Shaping the Limits of the Intelligible Principle*

In the decade following *J.W. Hampton*, the Supreme Court decided two important nondelegation cases that solidified the intelligible principle as the standard to measure congressional delegation and helped define the standard's limits. In *Panama Refining Co. v. Ryan*,[51] the Court struck down a provision of the National Industry Recovery Act ("Recovery Act") in which Congress authorized the President to prohibit the transportation of petroleum products.[52] In striking down the provision, the Court pointed out three criteria to be considered when determining whether there has been an unlawful delegation of legislative authority: "whether the Congress has declared a policy with respect to that subject; whether the Congress has set up a standard for the President's action; [and] whether the Congress has required any finding by the President in the exercise of the

---

[48] The Court's biggest failure in *J.W. Hampton* was that it viewed the President's action as mere execution of an existing statute guided by an intelligible principle, when in reality it was granting the President the power to make laws.

[49] *See* Lawson, *supra* note 35, at 367–68.

[50] *J.W. Hampton*, 276 U.S. at 407.

[51] 293 U.S. 388 (1935).

[52] *Id.* at 405.

authority to enact the prohibition." The Court went on to find that none of the three criteria existed in the Recovery Act provision.[53]

First, the Court determined that Congress did not lay out a policy initiative with respect to transporting petroleum, but instead gave the President "unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit."[54] Second, the Court found that the provision "establishes no creterion [sic] to govern the President's course."[55] Third, the Court determined that the provision required no "finding by the President as a condition of his action."[56] As a result, the Court struck down the provision as an impermissible delegation of legislative authority.[57]

The three-part standard articulated in *Panama Refining Co.*—although not explicitly stated by the Court as a three-part standard—gave meaningful boundaries to the intelligible principle beyond what was first articulated in *J.W. Hampton*. Not only does Congress need to set forth a policy and plan to which the President's actions must conform, but Congress must also mandate that a certain condition exists before the President can take action. The impact of grafting conditional legislation into the intelligible principle was significant because it strengthened the constitutionality of the standard by ensuring that the President would not have the sole ability to create laws at his discretion, thus promoting both legislative accountability and the separation of powers.

Four months after *Panama Refining Co.*, the Court struck down a second provision of the Recovery Act in *A.L.A. Schechter Poultry Corp. v. United States*.[58] The provision at issue authorized the President to approve codes of "fair competition" among trade and industry associations after making a determination that the suggested codes "impose[d] no inequitable restrictions on admission to membership and [we]re truly representative."[59] Additionally, the provision allowed the President to impose conditions that he "deem[ed] necessary to

---

[53] *Id.* at 415.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.* at 430.
[58] 295 U.S. 495, 551 (1935).
[59] *Id.* at 538.

effectuate the policy herein declared."[60]  The Court held that this provision was an unconstitutional delegation of legislative power because "the discretion of the President in approving or prescribing codes . . . [wa]s virtually unfettered."[61]  While the provision seemingly invoked conditional legislation by requiring the President to make certain findings about the codes before approving them, the Court found that the provision "supplie[d] no standards"[62] and any restrictions left "virtually untouched the field of policy" that was envisioned by the underlying statute, making the President's findings "really but a statement of an opinion."[63]

   Again, the Court did not directly invoke the intelligible principle when striking down the provision in *A.L.A. Schechter Poultry*.  However, the Court compared the flexible tariff provision in *J.W. Hampton* with the Recovery Act provision in *A.L.A. Schechter Poultry*, stating how the provision in *J.W. Hampton* clearly limited the delegation of legislative power, while the provision in *A.L.A. Schechter Poultry* supplied no standards for the President's "legislative undertaking."[64] Drawing upon *J.W. Hampton* and *Panama Refining Co.*, the Court provided more insight into what it considers when determining whether there is an unconstitutional delegation of legislative authority.[65]  As in *Panama Refining Co.*, the Court referenced conditional legislation when it noted that the President's ability to approve codes could only occur after he determined the codes were fair.[66]  However, the Court found issue with this type of conditional legislation because the President was not making a factual determination, but rather a discretionary finding, as the term "fair" has no real measurable bounds.[67]  Additionally, the Court's holding called for Congress to

---

[60] *Id.* at 523. The policy goals of the Recovery Act were the rehabilitation, correction, and expansion of trades and industries, and only one specifically called for the Act "to eliminate unfair competitive practices . . . ." *Id.* at 535.

[61] *Id.* at 542.

[62] *Id.* at 541.

[63] *Id.* at 538.

[64] *Id.* at 541–42.

[65] *Id.* at 537–38.

[66] *Id.* at 538–39.

[67] *Id.* Compared to the conditional legislation in *Brig Aurora* and *Field*, the discretionary finding that needed to occur before the President could approve the codes in *A.L.A. Schechter Poultry* could not be measured by a numerical standard or a clear determination of whether a violation of an existing statute occurred.

articulate clear standards by which the President is to exercise his delegated authority, and that any delegation of authority that extended *beyond* the policy goals underlying the statute was impermissible.[68]

Both *Panama Refining Co.* and *A.L.A. Schechter Poultry* provide meaningful insight into the intelligible principle. Unfortunately, this insight has largely been dismissed based on the notion that the Court struck down congressional delegation in the 1930's solely because of the tension that existed between the Court and President Roosevelt.[69] The fact that the Court has not invalidated a statute as an unconstitutional delegation of legislative authority to the executive branch since 1935 largely supports this assertion.[70] Instead, the Court has repeatedly stretched the meaning of the intelligible principle beyond what was originally defined in *J.W. Hampton*, *Panama Refining Co.*, and *A.L.A. Schechter Poultry*, taking the life out of nondelegation jurisprudence.

---

[68] The Court found that the policy goals were too broad and gave no direction to the President when determining whether or not to approve the codes. *Id.* 534–35.

[69] *See* David Schoenbrod, *The Delegation Doctrine: Could the Court Give It Substance?*, 83 MICH. L. REV. 1223, 1237 n.86 (1985); FUNK, SHAPIRO & WEAVER, *supra* note 27, at 549–50 (discussing that although President Franklin Delano Roosevelt's infamous Court Packing Plan to alter the composition of the Court was unsuccessful, "it is widely viewed as prompting a shift in the Court's jurisprudence on a variety of issues," including the Court's adoption of a "more expansive position regarding Congress' power to delegate authority").

[70] However, the Court did strike down a delegation of legislative authority to *private* entities in *Carter v. Carter Coal Co.*, 298 U.S. 238, 278 (1936). In *Carter Coal*, Congress passed the Bituminous Coal Conservation Act, which established a commission to create new competition standards. *Id.* at 310–11. Members of the commission were selected based on the amount of coal they produced in relation to the national average. *Id.* at 281–82. The Supreme Court held that Congress' delegation of authority to the commission was unconstitutional because it conferred power not to an official body "but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Id.* at 311. While the Court struck down the delegation by citing to the Fifth Amendment's Due Process Clause, the nondelegation doctrine loomed largely in the background of the decision, with the Court calling Congress' actions "legislative delegation in its most obnoxious form." *Id.* The nondelegation doctrine in relation to private entities still remains a pillar of the original understanding of the doctrine: that Congress may not delegate *any* legislative authority.

### III. THE BREAKDOWN OF THE INTELLIGIBLE PRINCIPLE

At the time *J.W. Hampton* was decided, the United Sates was just eighteen months away from the Stock Market Crash of 1929, the beginning of the Great Depression, and FDR's New Deal.[71] These events signaled a change in the government's role in regulating society and played a large role in why the intelligible principle was so short-lived as an enforced standard of nondelegation jurisprudence.

Most notably, there was a massive growth of administrative agencies that fell under the authority of the executive branch during the New Deal.[72]   Administrative agencies undertake various policy and lawmaking functions that were once reserved for the legislature, adding an additional layer of bureaucracy between Congress, who enacts a statute, and the President to whom the statute delegates the authority.  This additional layer undermines one of the key purposes of the nondelegation doctrine: maintaining accountability.[73]   However, while the growth of administrative agencies posed a serious threat to the nondelegation doctrine and its purposes, neither Congress nor the United States Supreme Court actively sought to uphold the doctrine and follow the intelligible principle.  Instead, Congress began delegating large quantities of legislative authority to administrative agencies, and the Court repeatedly upheld these delegations under the guise of the intelligible principle.[74]   In

---

[71] The Stock Market Crash of 1929 occurred on October 4, 1929 and *J.W. Hampton* was decided on April 9, 1928.

[72] *See* Casazza, *supra* note 36, at 737 n.43.

[73] In his Note, *Liberty Requires Accountability: Checking Delegations to Independent Agencies*, David Casazza discusses extensively the political accountability issue with administrative agencies. In the context of nondelegation, Casazza writes that "[t]he commitment to nondelegation proceeds from the people's decision to place political power in the legislature. . . . When Congress delegates its policymaking power to an agency, the power of making laws passes out of the hands of those to whom the people have entrusted it." *Id.* at 737, 742, 746.

[74] There are cases in which the Court does not explicitly cite to the intelligible principle when discussing nondelegation but, based on the cases the Court cites to in determining whether there has a permissible delegation, it becomes apparent that the intelligible principle is being invoked. *See, e.g.*, Skinner v. Mid-American Pipeline Co., 490 U.S. 212, 218–19 (1989) (referring to *Mistretta v. United States* and *American Power & Light Co. v. Securities & Exchange Commission* to define the nondelegation doctrine and its principles); Lujan v. Defenders of Wildlife, 504 U.S. 555, 604 (1992) (Blackmun, J., dissenting) (referencing *Touby v. United States* and *American Power & Light Co. v. Securities & Exchange Commission* when discussing the Court upholding delegations under broad terms).

particular, there have been three major ways in which the Court has contributed to the breakdown of the intelligible principle. First, the Court upheld broad policy objectives and unlimited authority.[75]   Second, the Court inaccurately rearticulated the intelligible principle in *Mistretta v. United States*,[76] and revived the standard in a manner inconsistent with the original meaning. Third, the Court removed the requirement of conditional legislation as a requirement of the intelligible principle.[77]   In turn, a series of nondelegation cases illustrate that, as the decades progressed, the Court became more lax in its application of the intelligible principle, ultimately leading to the breakdown of the intelligible principle as a meaningful standard to measure congressional delegation.

## A.   Upholding Broad Policy Objectives and Boundless Agency Authority

The Supreme Court's first misstep in its application of the intelligible principle came just seven years after it struck down congressional delegation in *A.L.A. Schechter Poultry*.   In *National Broadcasting Co. v. United States*,[78] the Court examined the authority delegated to the Communications Commission in the Communications Act of 1934.   The Communications Commission was authorized to adopt regulations for radio broadcasting "as may be necessary to carry out the provisions of th[e] Act,"[79] namely to create regulations that were in the "public interest, convenience, or necessity."[80]   The Court held that this "public interest" policy objective was "a criterion which 'is as concrete as the complicated factors for judgment in such a field of delegated authority permit.' "[81]   This newly-created public

---

[75]   *See generally* Nat'l Broad. Co. v. United States, 319 U.S. 190 (1943); Yakus v. United States, 321 U.S. 414 (1944); Am. Power & Light Co. v. SEC, 329 U.S. 90 (1946).

[76]   488 U.S. 361 (1989).

[77]   *See infra* Section III.C.

[78]   319 U.S. 190 (1943).

[79]   *Id.* at 217.

[80]   *Id.* at 193–94.

[81]   *Id.* at 216 (quoting Fed. Commc'ns Comm. v. Pottsville Broad. Co., 309 U.S. 134, 138 (1940)).

interest standard, while seemingly ambiguous, was upheld in various forms as a sufficient policy objective under the intelligible principle.[82]

Then in *Yakus v. United States*,[83] the Court upheld the Emergency Price Control Act during World War II, which created the Office of Price Administration headed by a presidentially-appointed Price Administrator.[84]  The Act stated that the Price Administrator was to establish "fair and equitable" prices that reflected the Act's purpose as a wartime measure to stabilize prices.[85]  The Court found the Act to be a permissible delegation of legislative power because Congress "stated the legislative objective, . . . prescribed the method of achieving that objective—maximum price fixing—and . . . laid down standards to guide the administrative determination of both the occasions for the exercise of the price-fixing power, and the particular prices to be established."[86]  While stabilizing wartime prices was a narrower policy objective than the public interest standard, the Price Administrator had broad discretion on how to reach that objective.  Establishing "fair and equitable" prices is similarly broad compared to creating "codes of fair competition," language that the Court struck down for being too discretionary in *A.L.A. Schechter Poultry*.  This contrary result in *Yakus* demonstrates the Court was moving away from its original understanding of the intelligible principle and allowing Congress to delegate more authority to administrative agencies.

Another example of broad congressional delegation is found in *American Power & Light Co. v. Securities & Exchange Commission*.[87] There, Congress passed the Public Utility Holding Company Act, giving the Securities and Exchange Commission ("SEC") the authority to ensure that the holding company system did not "'unduly or unnecessarily complicate the structure' or

---

[82] *See, e.g.*, Fed. Power Comm'n v. Hope Nat. Gas Co. 320 U.S. 591, 611 (1944) (upholding delegation to the Federal Power Commission to fix "just and reasonable rates" for natural gas prices that were "consistent with the maintenance of adequate service in the public interest"); Fed. Commc'ns Comm. v. Pottsville Broad. Co., 309 U.S. 134, 137–38 (1940) (upholding the Communications Commission's authority to create a regulatory system that grants or denies licenses based on "public convenience, interest or necessity").

[83] 321 U.S. 414 (1944).

[84] *Id.* at 419.

[85] *Id.* at 420.

[86] *Id.* at 423.

[87] 329 U.S. 90 (1946).

'unfairly or inequitably distribute voting power among security holders.'"[88]    These phrases were challenged as impermissible delegations for being undefined and having no meaning.[89]   The Court upheld these phrases as sufficient delegations, and in doing so articulated what seemed to be a new standard for the intelligible principle.    The Court stated that delegations of legislative authority were sufficient so long as Congress laid out (1) a general policy, (2) "the public agency which is to apply" the policy, and (3) "the boundaries of this delegated authority."[90]   As in *Yakus*, the Court found that the terms "unfair and inequitable" were sufficient boundaries by which the SEC could implement regulations.[91]   In *American Power & Light Co.*, the Court justified such broad discretionary terms by stating that the terms "reflect[] . . . the necessities of modern legislation dealing with complex economic and societal problems."[92]     This justification illustrated how the Court recognized that it was not staying true to the original meaning of the intelligible principle, an unfortunate mistake that had an immense impact on nondelegation jurisprudence.

The Court's decisions in *National Broadcasting Co.*, *Yakus*, and *American Power & Light Co.* stripped the intelligible principle so far down that within two decades of its creation the standard had lost its original meaning.  Subsequent courts rarely even invoked the words "intelligible principle," and those that did often cited to the standards set forth in *American Power & Light Co.* to determine whether the delegation satisfied the intelligible principle.[93]   While it is not clear that the *J.W. Hampton* Court demanded that Congress articulate a *specific* "policy and plan," the Court's subsequent use of the intelligible principle to strike

---

[88] *Id.* at 104.

[89] *Id.*

[90] *Id.* at 105.

[91] *Id.*

[92] *Id.*

[93] *See, e.g.*, Loving v. United States, 517 U.S. 748, 771 (1996) (using *National Broadcasting Co.* as its standard and admitting that the Court has upheld "delegations under standards phrased in sweeping terms"); Bowsher v. Synar, 478 U.S. 714, 720 (1986) (using *Yakus* as a standard); Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst., 448 U.S. 607, 685–86 (1980) (Rehnquist, J., concurring) (citing *American Power & Light Co.* and the broad policy objectives upheld by the Court); Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 560 (1976); Lichter v. United States, 334 U.S. 742, 785 (1948) (citing *American Power & Light Co.* in discussing how the Court should interpret the standards set forth by Congress).

*ST. JOHN'S LAW REVIEW* [Vol. 91:247

down delegations in *Panama Refining Co.* and *A.L.A. Schechter Poultry* because they were too discretionary demonstrates that specificity *was* a required element of the original intelligible principle. Therefore, the Court's upholding of broad policy objectives and boundless agency authority is a major contribution to the breakdown of the intelligible principle for several reasons.

First, how the Court could repeatedly come to the conclusion that the phrase "public interest" is a concrete policy objective to guide an agency is something that puzzled even Justice Scalia, who, in his dissenting opinion in *Mistretta v. United States*, posed the question: "What legislated standard, one must wonder, can possibly be too vague to survive judicial scrutiny, when we have repeatedly upheld, in various contexts, a 'public interest' standard?"[94] This standard has effectively allowed Congress to grant administrative agencies the authority to create any rules they deem to be in the public interest, solely relying on the agency's own views and policy agenda rather than requiring Congress to set forth objective guidelines.

A second problem with the Court upholding broad policy objectives and delegations that give unlimited amounts of legislative authority to agencies is the manner in which the Court justifies its decisions. The Court never upholds phrases such as "public interest," "just and reasonable rates," "unfair methods of competition," or "relevant factors" by showing how and why these broad terms are consistent with the original meaning of the intelligible principle or the nondelegation doctrine. Instead, the Court simply states that because the Court has upheld similarly broad phrases in the past, the current delegation should also survive a nondelegation challenge.[95] Additionally, the Court justifies these broad standards by blaming the state of society; namely, the growth of the administrative state.[96] While this may be a legitimate argument

---

[94] Mistretta v. United States, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting).

[95] *See id.*, 488 U.S. at 374 (majority opinion) ("In light of our approval of these broad delegations, we harbor no doubt that Congress' delegation of authority to the Sentencing Commission is sufficiently specific and detailed to meet constitutional requirements."); *Loving*, 517 U.S. at 771 (admitting that since 1935 "we have since upheld, without exception, delegations under standards phrased in sweeping terms").

[96] *See, e.g., Mistretta*, 488 U.S. at 372 ("[O]ur jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an

in favor of giving administrative agencies more legislative authority, it does not justify the breadth of authority that the Court has upheld under the nondelegation doctrine. In fact, an argument can be made that the growth of today's administrative state is in part a result of the Court upholding broad delegations to agencies by Congress, enabling the creation of more agencies to relieve Congress of its duties in favor of bureaucrats. Therefore, the Court's upholding of broad policy objectives and unlimited boundaries of agency authority was a major contribution to the breakdown of the intelligible principle because it allowed agencies to exercise too much discretion and repudiated the original understanding of the intelligible principle.

### B. *The Inaccurate Rearticulation of the Intelligible Principle*

The second way the Court contributed to the breakdown of the intelligible principle was by adopting the three requirements outlined in *American Power & Light Co.* as the intelligible principle standard in *Mistretta v. United States*.[97] In *Mistretta*, the Court had to determine whether Congress delegated excessive authority to the United States Sentencing Commission in tasking the agency with creation of new sentencing guidelines.[98] In the underlying statute, "Congress charged the [Sentencing] Commission with three goals . . . specified four 'purposes' of sentencing that the Commission must pursue in carrying out its mandate" and "prescribed the specific tool—the guidelines system—for the Commission to use in regulating sentencing."[99] The Court held that the goals and standards articulated by the statute satisfied the intelligible principle.[100] In describing the requirements of the intelligible principle, the

---

ability to delegate power under broad general directives."); United States v. Robel, 389 U.S. 258, 274 (1967) ("Delegation of power under general directives is an inevitable consequence of our complex society, with its myriad, ever changing, highly technical problems."); Opp Cotton Mills, Inc. v. Adm'r of Wage and Hour Div. of Dep't of Labor, 312 U.S. 126, 145 (1941) ("In an increasingly complex society Congress obviously could not perform its functions if it were obliged to find all the facts subsidiary to the basic conclusions which support the defined legislative policy . . . .").

[97] *Mistretta*, 488 U.S. at 372–73.

[98] *Id.* at 370.

[99] *Id.* at 374.

[100] *Id.* at 371–74.

Court quoted its decision in *American Power & Light Co.*, stating that it is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."[101]

Following *Mistretta*, the Court continued to uphold congressional delegations under the broad terms of *American Power & Light Co.* In *Touby v. United States*,[102] Congress authorized the Attorney General to classify various drugs as controlled substances for purposes of criminal drug enforcement if doing so was "necessary to avoid an imminent hazard to the public safety."[103] The Court upheld this standard as being consistent with the intelligible principle by pointing out the Court's history of upholding delegations of authority to establish "fair and equitable" prices or rules in the "public interest."[104] "In light of these precedents," the Court declared, "one cannot plausibly argue that [the statute]'s 'imminent hazard to the public safety' standard is not an intelligible principle."[105] Ten years later, the Court decided *Whitman v. American Trucking Ass'ns*,[106] which was an important case in nondelegation jurisprudence because it was the first time Justice Thomas articulated his concerns about whether the intelligible principle is an appropriate standard to measure congressional delegation.[107] *Whitman* involved a challenge to a provision of the Clean Air Act, which authorized the Environmental Protection Agency ("EPA") to create air quality standards at a level "requisite to protect the public health."[108] The District of Columbia Court of Appeals previously held that the provision was an unconstitutional delegation of authority because

---

[101] *Id.* at 372–73 (quoting Am. Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946)). Justice Scalia, the lone dissenter, criticized, among other things, the Court's repeated upholding of the public interest standard as a sufficient policy objective. *Id.* at 416 (Scalia, J., dissenting).

[102] 500 U.S. 160 (1991).

[103] *Id.* at 162–63.

[104] *Id.* at 165 (first citing Yakus v. United States, 321 U.S. 414, 426–27 (1944); and then citing Nat'l Broad. Co., v. United States, 319 U.S. 190, 225–26 (1943)).

[105] *Id.*

[106] 531 U.S. 457 (2001).

[107] *See id.* at 487 (Thomas, J., concurring) ("I am not convinced that the intelligible principle doctrine serves to prevent all cessions of legislative power. . . . On a future day, however, I would be willing to address the question whether our delegation jurisprudence has strayed too far from our Founders' understanding of separation of powers.").

[108] *Id.* at 465 (majority opinion).

Congress had failed to set forth an intelligible principle.[109] However, the Supreme Court reversed, concluding that the term "requisite" meant "sufficient, but not more than necessary," and holding that the scope of discretion was a permissible delegation under various nondelegation precedents.[110]

The Court's rearticulation of the intelligible principle in *Mistretta*, using the requirements from *American Power & Light Co.*, was a major contribution to the breakdown of the intelligible principle because it completely removed the original meaning of the intelligible principle that was developed by *J.W. Hampton, Panama Refining Co.*, and *A.L.A. Schechter Poultry*. By solidifying general policy objectives as a requirement of the intelligible principle, the Court gave administrative agencies the ability to define the scope of these objectives with virtually no pushback. Additionally, while the third requirement from *American Power & Light Co.* calls for Congress to delineate boundaries of authority, the subsequent case law following *Mistretta* illustrates that Congress did not actually need to include quantifiable boundaries.[111] In both *Touby* and *Whitman*, the Court upheld the terms "necessary" and "requisite" as sufficient limits on authority as both are extremely discretionary terms that do not give agencies any real guidance.

Additionally, the rearticulation of the intelligible principle in *Mistretta* occurred four years after the Court adopted its policy of *Chevron* deference to administrative agencies.[112] For the purposes of this Note, the *Chevron* doctrine can be simplified into the idea of administrative deference when Congress is silent or ambiguous on an issue within a statute.[113] When this occurs,

---

[109] *Id.* at 472. The D.C. Court of Appeals determined that the provision "failed to state intelligibly how much is too much." *Id.* (quoting Am. Trucking Ass'ns, Inc. v. EPA, 175 F.3d 1027, 1034 (D.C. Cir. 1999), *modified*, 195 F.3d 4 (D.C. Cir. 1999)).

[110] *Id.* at 472–74.

[111] *See id.*; *see also* Touby v. United States, 500 U.S. 160 (1991).

[112] The doctrine is named after *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). In *Chevron*, the Court held that the Environmental Protection Agency's interpretation of the term "stationary source" was reasonable in the absence of an explicit definition from Congress. *Id.* at 840–41, 865–66. The Court reached its conclusion by creating a two-step analysis of an agency's interpretation of a statute. *Id.* at 842–43. The first step is to determine whether a statute is ambiguous. *Id.* If it is, then the second step is to determine whether the agency's interpretation of that statute is reasonable. *Id.* at 843. This analysis rests on a presumption that courts should defer to the agency's interpretation instead of creating their own. *Id.* at 844.

[113] *Id.* at 844–45.

*ST. JOHN'S LAW REVIEW* [Vol. 91:247

courts defer to the agency's interpretation of the statute so long as it is reasonable, instead of substituting their own interpretation of the statue.[114]   There are many constitutional and administrative law issues associated with *Chevron* that are beyond the scope of this Note.  However, *Chevron* deference is important because it has allowed administrative agencies to change policy goals articulated by Congress.[115]   Combined with *Mistretta*'s lax rearticualtion of the intelligible principle, the Court has allowed administrative agencies to assume tremendous discretion and authority when promulgating laws, thus eliminating congressional accountability and raising concerns over separation of powers.

The Court's rearticulation and subsequent application of the intelligible principle in *Mistretta* shows that the intelligible principle is a dead standard for nondelegation jurisprudence.  In fact, since *Whitman*, the Court has been virtually silent on the issue of congressional delegations.[116]   It was not until the Court's 2015 decision in *Department of Transportation v. Ass'n of American Railroads*[117] that the nondelegation doctrine resurfaced, in large part due to a lengthy concurrence by Justice Thomas.[118]   In *Department of Transportation v. Ass'n of American Railroads*, the Association challenged Congress' delegation of authority to Amtrak to issue "metrics and standards" that address the performance and scheduling of passenger railroad services.[119]   The Association argued that because Amtrak was a private entity any congressional delegation to Amtrak was unconstitutional,[120] but the Court concluded that Amtrak was a government entity.[121]   However, instead of then determining

---

[114] *Id.* at 843.

[115] *See* Schoenbrod, *supra* note 69, at 1242–43.

[116] From *Whitman* to the present, the Court has mentioned either nondelegation or the intelligible principle in only nine cases, none of them ruling on a delegation challenge. *See* Johnson v. United States, 135 S. Ct. 2551, 2575 (2015) (Alito, J., dissenting); Dep't of Transp. v. Ass'n of Am. R.R.s, 135 S. Ct. 1225, 1234 (2015); Reynolds v. United States, 565 U.S. 432, 438 (2012); Sykes v. United States, 564 U.S. 1, 15–16 (2011), *overruled by* Johnson v. United States, 135 S. Ct. 2551 (2015); Mayo Found. for Med. Educ. and Research v. United States, 562 U.S. 44, 56 (2011); Dillon v. United States, 560 U.S. 817, 842–43 (2010).

[117] 135 S. Ct. 1225 (2015).

[118] *See id.* at 1240–52 (Thomas, J., concurring).

[119] *Id.* at 1228 (majority opinion).

[120] *Id.*

[121] *Id.*

whether the statute granting Amtrak the authority to issue "metrics and standards" was a permissible delegation of authority, the Court remanded the case because the Court of Appeals had not ruled on the issue, thereby avoiding the opportunity to evaluate the merits of nondelegation and its application.[122]

## C.   The Disappearance of Conditional Legislation

Finally, the third way the United States Supreme Court contributed to the breakdown of the intelligible principle was its retreat from conditional legislation as a factor in measuring congressional delegation.  Since *A.L.A. Schechter Poultry*, there has been no call by the Court in nondelegation cases for agencies to satisfy some prerequisite before they can begin promulgating rules.[123]  Instead, the Court has allowed Congress to delegate purely legislative authority to agencies without first requiring that the agencies make some type of factual determination.

As discussed earlier, *J.W. Hampton* did delegate legislative power to the President by allowing him to fix new tariff rates, even though the Court viewed this as simply executing Congress' policy and plan.[124]  However, in *J.W. Hampton*, the President had to determine whether the differences in the current rates were unequal, and only *then* could he fix new rates as he deemed necessary.[125]  This factual determination as a prerequisite to the President exercising legislative authority was a type of conditional legislation, and in both *Panama Refining Co.* and *A.L.A. Schechter Poultry*, the Court referenced the fact that conditional legislation should be included when Congress is

---

[122] *Id.*

[123] Only Justice Thomas has expressed such desire in his concurring opinion in *Department of Transportation*. *Id.* at 1246–48 (Thomas, J., concurring). In *Clinton v. City of New York*, the government argued that the Line Item Veto was contingent legislation similar to the conditional legislation in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892). 524 U.S. 417, 442–45 (1998). The Court rejected this argument, concluding that the issue in the case was not a question of permissible delegation but rather that the Line Item Veto violated Article I, § 7. *Id.* at 444. However, Justice Breyer argued that the Line Item Veto was constitutional and that the "power the Act grants the President to prevent spending items from taking effect does not violate the 'nondelegation' doctrine." *Id.* at 490 (Breyer, J., dissenting).

[124] *See supra* Section II.B.

[125] J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 405–06 (1928).

delegating its authority.[126]  Unfortunately, by abandoning this requirement, the Court weakened the intelligible principle by making it easier for Congress to delegate purely legislative—and virtually unrestricted—authority.  This is a major failure of the Court because it undermines the separation of powers, which is one of the essential principles of nondelegation.

The Court's upholding of broad policy objectives and boundless agency authority, combined with its inaccurate rearticualtion of the intelligible principle in *Mistretta* and the removal of conditional legislation all greatly contributed to the breakdown of the intelligible principle.  While today the intelligible principle is largely dead, a reformulation of the standard can breathe life into nondelegation and bring the doctrine back to its constitutional roots.

### IV. The New-Old Intelligible Principle

The original intelligible principle test under *J.W. Hampton*, *Panama Refining Co.*, and *A.L.A. Schechter Poultry* required the United States Supreme Court to look for three factors to determine whether Congress permissibly delegated authority to the executive branch: (1) a detailed policy objective in the underlying statute; (2) a plan by which the executive was to carry out that objective; and (3) a finding made by the executive prior to using his delegated authority.[127]  Over the last eighty years, these factors have collapsed, moving from a detailed policy and plan to a general one and removing any type of conditional legislation.  The new standard proposed in this Note draws mainly on the original understanding of the intelligible principle, which is why the standard keeps the name "intelligible principle" instead of fashioning a new term to measure congressional delegation.  This new standard varies from the original intelligible principle because it acknowledges the changes in regards to both the size and scope of the government since the 1930's, namely administrative agencies, and therefore attempts to strike a balance by reviving the doctrine in a modern form.

---

[126]  Panama Refining Co. v. Ryan, 293 U.S. 388, 415 (1935); A.L.A. Schechter Poultry v. United States, 295 U.S. 495, 541–42 (1935).

[127]  *Panama Refining Co.*, 293 U.S. at 415; *A.L.A. Schechter Poultry*, 295 U.S. at 541–42; *J.W. Hampton*, 276 U.S. at 405–06.

*A.  New Three-Part Standard*

The new intelligible principle standard can be broken down into three requirements: (1) specific policy objectives; (2) conditional legislation; and (3) measurable boundaries of authority.  Each requirement draws on the original interpretation of the intelligible principle from *J.W. Hampton*, *Panama Refining Co.*, and *A.L.A. Schechter Poultry* and attempts to bring back the original understanding of the nondelegation doctrine.

1.  Specific Policy Objectives

The first requirement for the new intelligible principle is that Congress must articulate specific policy objectives.  This would directly overrule the current standard from *Mistretta*, which only calls for Congress to provide a general policy.  A specific policy objective would require Congress to clearly state a goal that the delegated agency is to accomplish, which cannot be subject to multiple interpretations.  For example, the public interest standard would not survive this requirement, because it is too broad and can be easily manipulated by the agency exercising the authority to promulgate rules to meet that objective.  Similarly, the "public health" and "public safety" objectives from *Whitman* and *Touby* would also fail under this requirement for being too ambiguous.  However, in *Mistretta*, the Sentencing Commission's objective was not only to create guidelines consistent with the purposes of sentencing,[128] but also to provide certainty and fairness in sentencing to avoid disparities among similar defendants and crimes committed.[129]  These two objectives would meet the specificity requirement because it is possible to determine whether the Commission has met these objectives by looking to the sentencing data itself to determine fairness rather than having the Commission speculate on what it considers to be fair.

2.  Conditional Legislation

The second requirement is a variation on conditional legislation that was the standard of nondelegation in early cases.  This requirement calls on Congress to have administrative

---

[128] 18 U.S.C. § 3553(a)(2) (2012).
[129] 28 U.S.C. § 991(b) (2012).

agencies make some type of factual determination about an issue before it can begin to promulgate rules. This is a variation on conditional legislation because it is *not* suggesting that Congress has to create every rule and only use agencies to execute those rules. Instead, it acknowledges that in today's society it would be impossible for Congress to create every rule, and so it authorizes agencies to exercise legislative authority. However, as a prerequisite to exercising that legislative authority, Congress must build into the statute some type of condition that will trigger the agency's authority.

This trigger could, like in *J.W. Hampton*, allow an agency to promulgate rules after it determines that a current practice is unequal or is contrary to a known and measurable policy objective. The type of determination required may be discretionary, but it would nonetheless be rooted in some type of factual basis to justify an agency's decision. For example, in *Field*, the factual determination the President had to make was whether certain countries imposed duties that were "reciprocally unequal and unreasonable."[130] While "unreasonable" is a discretionary term, "unequal" is a fixed standard, and therefore the President could only suspend free importation if a foreign country's duties were not equal to the duties in the United States.[131] Requiring this type of conditional legislation as a prerequisite will serve as a barrier, preventing an agency from using its delegated authority in situations where it is not warranted, and ensures that it is Congress' underlying authority that controls the agency's ability to exercise any legislative function.

3. Measurable Boundaries of Agency Authority

The third requirement pulls on a variety of factors to determine whether Congress has provided sufficient boundaries of authority that the agencies are confined to. Like the first requirement calling for specificity, a requirement of measurable boundaries of authority means that Congress cannot leave an agency unfettered discretion in achieving its policy objectives. For example, in *Mistretta*, Congress provided the Sentencing Commission various factors it needed to consider to create the

---

[130] Marshall Field & Co. v. Clark, 143 U.S. 649, 680 (1892).
[131] *Id.*

sentencing guidelines, and even provided a guideline system that the Commission needed to conform to.[132]   This satisfies the requirement because the Court can easily determine whether the Commission exceeded its delegated authority.   For example, the Commission would be found to have exceeded its authority if it considered factors outside those articulated by Congress, or if it did not conform to the guideline system provided.[133]   In contrast, the statute at issue in *Whitman* would fail this requirement—in addition to failing the first requirement—because the boundary of achieving its goal of protecting the public health was at a level the agency deemed "requisite," which is a highly subjective and limitless standard.[134]   The Court would not be able to determine whether the EPA exceeded its delegated authority and therefore would find that Congress did not articulate a clearly defined boundary of authority.

Because providing measurable bounds of authority could itself be considered a flexible standard, the Court must consider two factors that would narrow the scope of Congress' delegable authority thereby increasing Congress' responsibility to ensure that its statutes do not delegate unrestricted authority to agencies.   First, the Court must consider whether Congress has mandated part of the agency's daily operations.   Mandating daily operations requires Congress to carefully examine agency functions and removes agency discretion in favor of statutory requirements.   An example of such action can be found in *Department of Transportation v. Ass'n of American Railroads*, in which the Court found that Congress had mandated aspects of Amtrak's day-to-day operations in its underlying statute by

---

[132]   Mistretta v. United States, 488 U.S. 361, 374–76 (1989).

[133]   Under the new intelligible principle standard, *Mistretta* would survive a nondelegation challenge on the issue of whether Congress sufficiently prescribed the limits of the Sentencing Commission's authority. However, there is a separate issue, discussed   Justice Scalia's dissenting opinion, that Congress' delegation to the Sentencing Commission was unconstitutional because it created a "junior-varsity Congress" within the judicial branch. *Id.* at 427 (Scalia, J., dissenting). On this issue, *Mistretta* may not survive a delegation challenge because delegating legislative authority to the judiciary is a clear violation of the separation of powers doctrine. For the purposes of this Note, *Mistretta* is used as an example of how Congress could satisfy the new intelligible principle irrespective of the separation of powers issue. Had Congress delegated the authority to create new sentencing guidelines to the Department of Justice or another administrative agency within the executive branch, then Congress clearly would have been within its authority to delegate.

[134]   Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 473–74 (2001).

requiring Amtrak to maintain certain transportation routes.[135] Requiring Congress to mandate an agency's daily functions is an important addition to the intelligible principle because it places greater restrictions on an agency's legislative authority by removing some of that power and simultaneously increases congressional oversight and accountability.

Second, when the Court has to consider whether an agency acted in accordance with its delegated authority in the context of *Chevron* deference, the Court should reject the presumption of administrative deference that has allowed agencies to exercise immense discretion when promulgating rules. Under this new standard, when Congress has not explicitly delegated authority to an agency on a particular issue, the Court should not engage in determining whether the agency's interpretation of the statute is a reasonable one as it currently does under *Chevron*. Instead, the Court should rule that Congress did not intend the agency to exercise authority on that issue. Requiring the Court to find against administrative deference will put pressure on Congress to explicitly state an agency's boundary of authority. If Congress fails to do so, then the agency cannot exercise that authority and Congress must amend the statute or provide some other alternative if it wishes the agency to have such authority.[136]

While this new three-part intelligible principle strays from the original meaning of nondelegation, it strays out of necessity and not out of blindness. The goal of this new intelligible principle is to hold Congress to a higher standard and ensure that any delegation of legislative authority to administrative agencies is as close to the original intelligible principle as possible, while accounting for the dramatic changes to our governmental structure. Under this new standard, agencies will have more direction and focus when promulgating rules. Additionally, because Congress will be responsible for giving

---

[135] Dep't of Transp. v. Ass'n of Am. R.R.s, 135 S. Ct. 1225, 1232 (2015).

[136] The applicability of *Chevron* deference was recently questioned in *King v. Burwell*, 135 S. Ct. 2480 (2015). In determining that Congress did not intend for the Internal Revenue Service to have authority in crafting health insurance policies, the Court first noted that "[i]n extraordinary cases . . . there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* at 2488–89 (citation omitted). The Court then suggested that deference to administrative agencies may not apply in "question[s] of deep 'economic and political significance' . . . had Congress wished to assign that question to an agency, it surely would have done so expressly." *Id.* at 2489.

detailed objectives and guidelines to the agencies, it will be easier to hold Congress accountable if the rules fail or have adverse effects on the public.

### B.  *How the New Intelligible Principle is Different from Other Proposals for Nondelegation Reform*

The intelligible principle has been around for almost a century, and as a result there have been many attempts to revive the standard and reform nondelegation jurisprudence.  However, none of the proposed reforms address the congressional delegations with the breadth that this new three-part standard proposes.  For example, in his concurring opinion in *Department of Transportation v. Ass'n of American Railroads*, Justice Thomas advocated a "return to the original understanding of the federal legislative power [to] require that the Federal Government create generally applicable rules of private conduct only through the constitutionally prescribed legislative process."[137]  To Justice Thomas' displeasure, Congress cannot by itself make all of the rules and regulations and only delegate authority to agencies to execute those rules.  That is impractical today and would shut down the government, a fact that the Court has repeatedly realized throughout nondelegation jurisprudence.[138]  The simple truth is that administrative agencies are needed to promulgate rules, but that does not mean agencies should have unlimited discretion in the quality and quantity of rules they develop, which is what the current intelligible principle allows.  The second requirement of the new intelligible principle addresses this through conditional legislation from a modern perspective. Recognizing that delegation of legislative authority has existed since *J.W. Hampton*, the standard requires agencies exercising such authority to make some type of factual—and likely semi-discretionary—determination before it can begin promulgating laws.

Additionally, some scholars argue for a flexible approach to nondelegation, in which the original meaning of the Constitution supports a strict application of the doctrine in most cases, but

---

[137] *Ass'n of Am. R.R.s*, 135 S. Ct. at 1246 (Thomas, J., concurring).
[138] *See supra* note 96 and accompanying text.

does not apply to "certain selected parts of the law."[139]  Others argue that the test for delegation should be whether the delegated authority relates to a matter of basic importance or is ancillary to the statutory scheme.[140]  However, these approaches to nondelegation are still too ambiguous and can lead to inconsist applications.  Allowing the executive branch the discretion to implement ancillary matters of a statute but not matters of basic importance raises the questions as to what matters will be defined as ancillary and what matters will be defined as of basic importance.  Those terms better align with the current ambiguity already allowed in nondelegation jurisprudence, and therefore any nondelegation analysis would look similar to the current practice of the Court allowing ambiguity to stand in favor of efficiency.  The new three-part standard does not distinguish between matters, but instead takes the position that all delegation of legislative authority must be measured uniformly, with the focus being whether Congress was specific enough in describing the amount of power the agency can exercise.

   Professor David Schoenbrod believes that "[t]he test of permissible delegation should look not to what quantity of power a statute confers but to what kind . . . ."[141]  Schoenbrod argues that "the statute itself must speak to what people cannot do; the statute may not merely recite regulatory goals and leave it to an agency to promulgate the rules to achieve those goals."[142]  While the new three-part standard incorporates Schoenbrod's idea that Congress cannot simply recite goals that agencies are free to create rules to achieve, the new standard differs from Schoenbrod because it does not require Congress to state exactly what the agencies cannot do.  Instead, if Congress does not explicitly grant authority to an agency, it is presumed not to have the ability to promulgate in that area.  Since the goal of the intelligible

---

[139] Michael B. Rappaport, *The Selective Nondelegation Doctrine and the Line Item Veto: A New Approach to the Nondelegation Doctrine and Its Implications for Clinton v. City of New York*, 76 TUL. L. REV. 265, 265 (2001).

[140] Lawson, *supra* note 35, at 334. Lawson argues that an original understanding of executive power allows executive officials "to exercise discretion with respect to minor or ancillary matters in the implementation of statutes . . . [b]ut a statute that leaves to executive (or judicial) discretion matters that are of basic importance to the statutory scheme" would create a nondelegation problem. *Id.*

[141] Schoenbrod, *supra* note 69, at 1227.

[142] *Id.*

principle is to minimize the discretionary power exercised by agencies and uphold the separation of powers consistent with the original meaning of nondelegation, if Congress were required to state everything that an agency cannot do, anything Congress did not exclude could be interpreted as a presumptive delegation to the agency.  The third requirement of the new intelligible principle prevents this interpretation by ensuring that an agency does not get the benefit of the doubt when Congress does not speak to a certain issue in the statute.

Finally, there have recently been calls for a heightened intelligible principle standard by simply reversing the *Chevron* presumption that ambiguity within a statute equals congressional delegation.[143]  By reversing this presumption, "courts would hold that delegation could only take place narrowly—when Congress has clearly delineated the standard that it intends the agency to achieve."[144]  However, while reversing the *Chevron* presumption of administrative deference would certainly be a means of eliminating an agency's ability to create its own interpretations of statutes, it would "merely shift discretion from the independent agency to the reviewing court . . . to determine when Congress has or has not spoken authoritatively."[145]  This still leaves the potential for courts to uphold broad statutory language, something that the intelligible principle is meant to prevent.  Therefore, built into the third part of the new standard is not only a call for the reversal of *Chevron* deference, but also a call for Congress to directly address any ambiguity of whether or not the agency has authority to act on a particular issue, instead of relying on the Court to determine Congress' intent.

Ultimately, the new intelligible principle is a viable standard for nondelegation cases because it is multi-dimensional, requiring courts to give a comprehensive examination of what exactly Congress has delegated to an agency.  Should the Court adopt this new intelligible principle standard, it will be a

---

[143]  *See* Casazza, *supra* note 36, at 755–56.

[144]  *Id.* at 756. Casazza goes on to say that under this new approach, "[T]he delegation in *J.W. Hampton*, which required only calculation and adjustment of a tariff based on fluctuating prices, would stand while the delegation in *Whitman*, which asked the agency to restrict pollutants to the level 'requisite to protect public health' without defining public health . . . would fail." *Id.*

[145]  *Id.* at 757.

*ST. JOHN'S LAW REVIEW* [Vol. 91:247

significant step towards maintaining accountability and the separation of powers doctrine that are central to the nondelegation doctrine.

CONCLUSION

The nondelegation doctrine stands as the foundation of the United States Constitution's Vesting Clause, and the intelligible principle standard was intended to give the United States Supreme Court power to uphold the doctrine and its Constitutional underpinnings. But over the last eighty years, the standard has crumbled, allowing Congress "to avoid hard choices" by passing the legislative responsibility to administrative agencies that do not derive their authority from the consent of the public.[146] The Supreme Court has repeatedly shown that the intelligible principle is little more than a speed bump that Congress must pass over on its way to delegating essentially unrestricted legislative authority, effectually undermining the purposes of the nondelegation doctrine and the separation of powers. The new three-part intelligible principle attempts to bring the standard as close as possible to its constitutional roots while simultaneously ensuring that the government can still function in today's complex administrative state.

---

[146] *See* Schoenbrod, *supra* note 69, at 1225.