# Exhibit K



Case 1:22-cv-01144-RC   Document 2-11   Filed 05/02/22   Page 2 of 14

# CONSTITUTION ANNOTATED
Analysis and Interpretation of the U.S. Constitution

## ArtI.S1.2.2 The Nature and Scope of Permissible Delegations

Article I, Section 1:

> *All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.*

Application of two distinct constitutional principles contributed to the development of the nondelegation doctrine: separation of powers and due process. A rigid application of separation of powers would prevent the lawmaking branch from divesting itself of any of its power and conferring it on one of the other branches. But the doctrine is not so rigidly applied as to prevent conferral of significant authority on the executive branch.[1] In *J. W. Hampton, Jr. & Co. v. United States*,[2] Chief Justice Taft explained the doctrine's import in the delegation context. "The Federal Constitution . . . divide[s] the governmental power into three branches. . . . [I]n carrying out that constitutional division into three branches it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power. This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination."[3]

In *Loving v. United States*,[4] the Court distinguished between its usual separation-of-powers doctrine—emphasizing arrogation of power by a branch and impairment of another branch's ability to carry out its functions—and the delegation doctrine, "another branch of our separation of powers jurisdiction," which is informed not by

4/8/22, 11:30 AM	1.2.2 Nature and Scope of Permissible Delegations | Constitution Annotated | Congress.gov | Library of Congress

Case 1:22-cv-01144-RC Document 2-11 Filed 05/02/22 Page 3 of 14

the arrogation and impairment analyses but solely by the provision of standards.[5] This confirmed what had long been evident—that the delegation doctrine is unmoored to traditional separation-of-powers principles.

The second principle underlying delegation law is a due process conception that undergirds delegations to administrative agencies. The Court has contrasted the delegation of authority to a public agency, which typically is required to follow established procedures in building a public record to explain its decisions and to enable a reviewing court to determine whether the agency has stayed within its ambit and complied with the legislative mandate, with delegations to private entities, which typically are not required to adhere to such procedural safeguards.[6]

Two theories suggested themselves to the early Court to justify the results of sustaining delegations. The Chief Justice alluded to the first in *Wayman v. Southard*.[7] He distinguished between "important" subjects, "which must be entirely regulated by the legislature itself," and subjects "of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions, to fill up the details." While his distinction may be lost, the theory of the power "to fill up the details" remains current. A second theory, formulated even earlier, is that Congress may legislate contingently, leaving to others the task of ascertaining the facts that bring its declared policy into operation.[8]

## Filling Up the Details

In finding a power to "fill up the details," the Court in *Wayman v. Southard*[9] rejected the contention that Congress had unconstitutionally delegated power to the federal courts to establish rules of practice.[10] Chief Justice Marshall agreed that the rulemaking power was a legislative function and that Congress could have formulated the rules itself, but he denied that the delegation was impermissible. Since then, of course, Congress has authorized the Supreme Court to prescribe rules of procedure for the lower federal courts.[11]

Filling up the details of statutes has long been the standard. For example, the Court upheld a statute requiring the manufacturers of oleomargarine to have their packages "marked, stamped and branded as the Commissioner of Internal Revenue . . . shall prescribe," rejecting a contention that the prosecution was not for violation of law but

4/8/22, 11:30 AM
Case 1:22-cv-01144-RC   Document 2-1   Filed 05/02/22   Page 4 of 14
2.2.2 Nature and Scope of Permissible Delegations | Constitution Annotated | Congress.gov | Library of Congress

for violation of a regulation.[12] "The criminal offence," said Chief Justice Fuller, "is fully and completely defined by the act and the designation by the Commissioner of the particular marks and brands to be used was a mere matter of detail."[13] *Kollock* was not the first such case,[14] and it was followed by a multitude of delegations that the Court sustained. In one such case, for example, the Court upheld an act directing the Secretary of the Treasury to promulgate minimum standards of quality and purity for tea imported into the United States.[15]

## Contingent Legislation

An entirely different problem arises when, instead of directing another department of government to apply a general statute to individual cases, or to supplement it by detailed regulation, Congress commands that a previously enacted statute be revived, suspended, or modified, or that a new rule be put into operation, upon the finding of certain facts by an executive or administrative officer. Since the delegated function in such cases is not that of "filling up the details" of a statute, authority for it must be sought under some other theory.

Contingent delegation was approved in an early case, *The Brig Aurora*,[16] upholding the revival of a law upon the issuance of a presidential proclamation. After previous restraints on British shipping had lapsed, Congress passed a new law stating that those restrictions should be renewed in the event the President found and proclaimed that France had abandoned certain practices that violated the neutral commerce of the United States. To the objection that this was an invalid delegation of legislative power, the Court answered briefly that "we can see no sufficient reason, why the legislature should not exercise its discretion in reviving the act of March 1st, 1809, either expressly or conditionally, as their judgment should direct."[17]

The theory was used again in *Field v. Clark*,[18] where the Tariff Act of 1890 was assailed as unconstitutional because it directed the President to suspend the free importation of enumerated commodities "for such time as he shall deem just" if he found that other countries imposed upon agricultural or other products of the United States duties or other exactions that "he may deem to be reciprocally unequal and unjust." In sustaining this statute the Court relied heavily upon two factors: (1) legislative precedents, which demonstrated that "in the judgment of the legislative branch of the government, it is often desirable, if not essential, . . . to invest the

President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations,"[19] and (2) that the act did "not, in any real sense, invest the President with the power of legislation. . . . Congress itself prescribed, in advance, the duties to be levied, . . . while the suspension lasted. Nothing involving the expediency or the just operation of such legislation was left to the determination of the President. . . . He had no discretion in the premises except in respect to the duration of the suspension so ordered."[20] By similar reasoning, the Court sustained the flexible provisions of the Tariff Act of 1922 whereby duties were increased or decreased to reflect differences in cost of production at home and abroad, as such differences were ascertained and proclaimed by the President.[21]

## Standards

Implicit in the concept of filling in the details is the idea that there is some intelligible guiding principle or framework to apply. Indeed, the requirement that Congress set forth "intelligible principles" or "standards" to guide as well as limit the agency or official in the performance of its assigned task has been critical to the Court's acceptance of legislative delegations. In theory, the requirement of standards serves two purposes: "it insures that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people . . . , [and] it prevents judicial review from becoming merely an exercise at large by providing the courts with some measure against which to judge the official action that has been challenged."[22]

The only two instances in which the Court has found an unconstitutional delegation to a public entity have involved grants of discretion that the Court found to be unbounded, hence standardless. Thus, in *Panama Refining Co. v. Ryan*,[23] the President was authorized to prohibit the shipment in interstate commerce of "hot oil"—oil produced in excess of state quotas. Nowhere—not in the language conferring the authority, nor in the "declaration of policy," nor in any other provision—did the statute specify a policy to guide the President in determining when and under what circumstances to exercise the power.[24] Although the scope of granted authority in *Panama Refining* was narrow, the grant in *A. L. A. Schechter Poultry Corp. v. United States*[25] was sweeping. The National Industrial Recovery Act devolved on the executive branch the power to formulate codes of "fair competition" for all industry in order to promote "the policy of this title." The policy was "to eliminate unfair

competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, . . . and otherwise to rehabilitate industry. . . ."[26] Though much of the opinion is written in terms of the failure of these policy statements to provide meaningful standards, the Court was also concerned with the delegation's vast scope—the "virtually unfettered" discretion conferred on the President of "enacting laws for the government of trade and industry throughout the country."[27]

Typically the Court looks to the entire statute to determine whether there is an intelligible standard to guide administrators, and a statute's declaration of policies or statement of purposes can provide the necessary guidance. If a statute's declared policies are not open-ended, then a delegation of authority to implement those policies can be upheld. For example, in *United States v. Rock Royal Co-operative, Inc.*,[28] the Court contrasted the National Industrial Recovery Act's statement of policy, "couched in most general terms" and found lacking in *Schechter*, with the narrower policy that an agricultural marketing law directed the Secretary of Agriculture to implement.[29] Similarly, the Court found ascertainable standards in the Emergency Price Control Act's conferral of authority to set prices for commodities if their prices had risen in a manner "inconsistent with the purposes of this Act."[30]

The Court has been notably successful in finding standards that are constitutionally adequate. Standards have been ascertained to exist in such formulations as "just and reasonable,"[31] "public interest,"[32] "public convenience, interest, or necessity,"[33] "unfair methods of competition,"[34] and "requisite to protect the public health [with] an adequate margin of safety."[35] Thus, in *National Broadcasting Co. v. United States*,[36] the Court found that the discretion conferred on the Federal Communications Commission to license broadcasting stations to promote the "public interest, convenience, or necessity" conveyed a standard "as complete as the complicated factors for judgment in such a field of delegated authority permit."[37] Yet the regulations upheld were directed to the contractual relations between networks and stations and were designed to reduce the effect of monopoly in the industry, a policy on which the statute was silent.[38] When, in the Economic Stabilization Act of 1970, Congress authorized the President "to issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages, and salaries," and the President responded by imposing broad national controls, the lower court decision

sustaining the action was not even appealed to the Supreme Court.[39] Explicit standards are not even required in all situations, the Court having found standards reasonably implicit in a delegation to the Federal Home Loan Bank Board to regulate banking associations.[40]

The Court has emphatically rejected the idea that administrative implementation of a congressional enactment may provide the intelligible standard necessary to uphold a delegation. The Court's decision in *Lichter v. United States*[41] could be read as approving of a bootstrap theory, the Court in that case having upheld the validity of a delegation of authority to recover "excessive profits" as applied to profits earned prior to Congress's incorporation into the statute of the administrative interpretation.[42] In *Whitman v. American Trucking Associations*,[43] however, the Court asserted that *Lichter* mentioned agency regulations only "because a subsequent Congress had incorporated the regulations into a revised version of the statute."[44] "We have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute,"[45] the Court concluded.

Even in "sweeping regulatory schemes" that affect the entire economy, the Court has "never demanded . . . that statutes provide a 'determinate criterion' for saying 'how much [of the regulated harm] is too much.'"[46] Thus Congress need not quantify how "imminent" is too imminent, how "necessary" is necessary enough, how "hazardous" is too hazardous, or how much profit is "excess." Rather, discretion to make such determinations may be conferred on administrative agencies.[47]

Although Congress must ordinarily provide some guidance that indicates broad policy objectives, there is no general prohibition on delegating authority that includes the exercise of policy judgment. In *Mistretta v. United States*,[48] the Court approved congressional delegations to the United States Sentencing Commission, an independent agency in the judicial branch, to develop and promulgate guidelines binding federal judges and cabining their discretion in sentencing criminal defendants. Although the Court enumerated the standards Congress had provided, it admitted that significant discretion existed with respect to making policy judgments about the relative severity of different crimes and the relative weight of the characteristics of offenders that are to be considered, and stated forthrightly that

4/8/22, 11:30 AM                                                    2.2. Nature and Scope of Permissible Delegations | Constitution Annotated | Congress.gov | Library of Congress

Case 1:22-cv-01144-RC   Document 2-11   Filed 05/02/22   Page 8 of 14

delegations may carry with them "the need to exercise judgment on matters of policy."[49] A number of cases illustrate the point. For example, the Court has upheld complex economic regulations of industries in instances in which the agencies had first denied possession of such power, had unsuccessfully sought authorization from Congress, and had finally acted without the requested congressional guidance.[50] The Court has also recognized that, when Administrations change, new officials may have sufficient discretion under governing statutes to change or even reverse agency policies.[51]

It seems therefore reasonably clear that the Court does not require much in the way of standards from Congress. The minimum upon which the Court usually insists is that Congress use a delegation that "sufficiently marks the field within which the Administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will."[52] Where the congressional standards are combined with requirements of notice and hearing and statements of findings and considerations by the administrators, so that judicial review under due process standards is possible, the constitutional requirements of delegation have been fulfilled.[53] This requirement may be met through the provisions of the Administrative Procedure Act,[54] but where that Act is inapplicable or where the Court sees the necessity for exceeding its provisions, due process can supply the safeguards of required hearing, notice, supporting statements, and the like.[55]

## Preemptive Reach of Delegated Authority

In exercising a delegated power the President or another officer may effectively suspend or rescind a law passed by Congress, or may preempt state law. A rule or regulation properly promulgated under authority received from Congress is *law*, and under the supremacy clause of the Constitution can preempt state law.[56] Similarly, a valid regulation can supersede a federal statute. Early cases sustained contingency legislation giving the President power, upon the finding of certain facts, to revive or suspend a law,[57] and the President's power to raise or lower tariff rates equipped him to alter statutory law.[58] The Court in *Opp Cotton Mills v. Administrator*[59] upheld Congress's decision to delegate to the Wage and Hour Administrator of the Labor Department the authority to establish a minimum wage in particular industries greater than the statutory minimum but no higher than a prescribed figure. Congress has not often expressly addressed the issue of repeals or supersessions, but in

authorizing the Supreme Court to promulgate rules of civil and criminal procedure and of evidence it directed that such rules supersede previously enacted statutes with which they conflict.[60]. In Davis v. United States, 411 U.S. 233, 241 (1973), the Court referred in passing to the supersession of statutes without evincing any doubts about the validity of the results. When Congress amended the Rules Enabling Acts in the 100th Congress, Pub. L. No. 100-702, 102 Stat. 4642, 4648, *amending* 28 U.S.C. § 2072, the House would have altered supersession, but the Senate disagreed, the House acquiesced, and the old provision remained. *See* H.R. 4807, H. REP. NO. 100-889, 100th Cong., 2d sess. (1988), 27-29; 134 CONG REC. 23,573–84 (1988), *id.* at 31,051–52 (Sen. Heflin); *id.* at 31,872 (Rep. Kastenmeier).

---

**Footnotes**

1. ^ Field v. Clark, 143 U.S. 649, 692 (1892); Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 42 (1825).

2. ^ 276 U.S. 394 (1928).

3. ^ 276 U.S. at 406. Chief Justice Taft traced the separation of powers doctrine to the maxim, Delegata potestas non potest delegari (a delegated power may not be delegated), 276 U.S. at 405, but the maxim does not help differentiate between permissible and impermissible delegations, and Court has not repeated this reference in later delegation cases.

4. ^ 517 U.S. 748 (1996).

5. ^ 517 U.S. at 758–59.

6. ^ Carter v. Carter Coal Co., 298 U.S. 238, 310–12 (1936); Yakus v. United States, 321 U.S. 414, 424–25 (1944). Because the separation-of-powers doctrine is inapplicable to the states as a requirement of federal constitutional law, Dreyer v. Illinois, 187 U.S. 71, 83–84 (1902), it is the Due Process Clause to which federal courts must look for authority to review delegations by state legislatures. *See, e.g.*, Eubank v. City of Richmond, 226 U.S. 137 (1912); Embree v. Kansas City Road Dist., 240 U.S. 242 (1916).

7. ^ 23 U.S. (10 Wheat.) 1, 41 (1825).

8. ^ The Brig Aurora, 11 U.S. (7 Cr.) 382 (1813).

9. ^ 23 U.S. (10 Wheat.) 1 (1825).

10. ^ Act of May 8, 1792, § 2, 1 Stat. 275, 276.

11. ^ The power to promulgate rules of civil procedure was conferred by the Act of June 19, 1934, 48 Stat. 1064; the power to promulgate rules of criminal procedure was conferred by the Act of June 29, 1940, 54 Stat. 688. These authorities are now subsumed under 28 U.S.C. § 2072. In both instances Congress provided for submission of the rules to it, presumably reserving the power to change or to veto the rules. Additionally, Congress has occasionally legislated rules itself. *See, e.g.*, 82 Stat. 197 (1968), 18 U.S.C. §§ 3501-02 (admissibility of confessions in federal courts).

12. ^ In re Kollock, 165 U.S. 526 (1897).

13. ^ 165 U.S. at 533.

14. ^ United States v. Bailey, 34 U.S. (9 Pet.) 238 (1835); Caha v. United States, 152 U.S. 211 (1894).

15. ^ Buttfield v. Stranahan, 192 U.S. 470 (1904). *See also* United States v. Grimaud, 220 U.S. 506 (1911) (upholding act authorizing executive officials to make rules governing use of forest reservations); ICC v. Goodrich Transit Co., 224 U.S. 194 (1912) (upholding delegation to prescribe methods of accounting for carriers in interstate commerce).

16. ^ 11 U.S. (7 Cr.) 382 (1813).

17. ^ 11 U.S. (7 Cr.) at 388.

18. ^ 143 U.S. 649 (1892).

19. ^ 143 U.S. at 691.

20. ^ 143 U.S. at 692, 693.

21. ^ J. W. Hampton, Jr. & Co. v. United States, 276 U.S. 394 (1928).

22. ^ Arizona v. California, 373 U.S. 546, 626 (1963) (Harlan, J., dissenting).

23. ^ 293 U.S. 388 (1935).

4/8/22, 11:30 AM	The Nature and Scope of Permissible Delegations | Constitution Annotated | Congress.gov | Library of Congress

Case 1:22-cv-01144-RC Document 2-11 Filed 05/02/22 Page 11 of 14

24. ^ The Court, in the view of many observers, was influenced heavily by the fact that the President's orders were nowhere published and notice of regulations bearing criminal penalties for their violations was spotty at best. *Cf.* E. CORWIN, THE PRESIDENT: OFFICE AND POWERS 1787–1957 394–95 (4th ed. 1958). The result of the Government's discomfiture in Court was enactment of the Federal Register Act, 49 Stat. 500 (1935), 44 U.S.C. § 301, providing for publication of Executive Orders and agency regulations in the daily Federal Register.

25. ^ 295 U.S. 495 (1935).

26. ^ 48 Stat. 195 (1933), Tit. I, § 1.

27. ^ 295 U.S. at 542. A delegation of narrower scope led to a different result in Fahey v. Mallonee, 332 U.S. 245, 250 (1947), the Court finding explicit standards unnecessary because "[t]he provisions are regulatory" and deal with but one enterprise, banking, the problems of which are well known and the authorized remedies as equally well known. "A discretion to make regulations to guide supervisory action in such matters may be constitutionally permissible while it might not be allowable to authorize creation of new crimes in uncharted fields." The Court has recently explained that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." Whitman v. American Trucking Ass'ns, 531 U.S. 457, 475 (2001) (Congress need not provide "any direction" to EPA in defining "country elevators," but "must provide substantial guidance on setting air standards that affect the entire national economy").

28. ^ 307 U.S. 533 (1939).

29. ^ 307 U.S. at 575. Other guidance in the marketing law limited the terms of implementing orders and specified the covered commodities.

30. ^ Yakus v. United States, 321 U.S. 414 (1944) (the principal purpose was to control wartime inflation, and the administrator was directed to give "due consideration" to a specified pre-war base period).

31. ^ Tagg Bros. & Moorhead v. United States, 280 U.S. 420 (1930).

32. ^ New York Central Securities Corp. v. United States, 287 U.S. 12 (1932).

33. ^ Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266 (1933).

34. ^ FTC v. Gratz, 253 U.S. 421 (1920).

35. ^ Whitman v. American Trucking Ass'ns, 531 U.S. 547 (2001).

36. ^ 319 U.S. 190 (1943).

37. ^ 319 U.S. at 216.

38. ^ Similarly, the promulgation by the FCC of rules creating a "fairness doctrine" and a "right to reply" rule has been sustained, Red Lion Broadcasting Co. v. FCC, 395 U.S. 367 (1969), as well as a rule requiring the carrying of anti-smoking commercials. Banzhaf v. FCC, 405 F.2d 1082 (D.C. Cir. 1968), cert. denied sub nom. Tobacco Institute v. FCC, 396 U.S. 842 (1969).

39. ^ Amalgamated Meat Cutters & Butcher Workmen v. Connally, 337 F. Supp. 737 (D.D.C. 1971). The three-judge court relied principally on Yakus.

40. ^ Fahey v. Mallonee, 332 U.S. 245, 250 (1947) (the Court explained that both the problems of the banking industry and the authorized remedies were well known).

41. ^ 334 U.S. 742 (1948).

42. ^ In upholding the delegation as applied to the pre-incorporation administrative definition, the Court explained that "[t]he statutory term 'excessive profits,' in its context, was a sufficient expression of legislative policy and standards to render it constitutional." 334 U.S. at 783. The "excessive profits" standard, prior to definition, was contained in Tit. 8 of the Act of October 21, 1942, 56 Stat. 798, 982. The administrative definition was added by Tit. 7 of the Act of February 25, 1944, 58 Stat. 21, 78.

43. ^ 531 U.S. 547 (2001).

44. ^ 531 U.S. at 472.

45. ^ 531 U.S. at 472.

46. ^ Whitman v. American Trucking Ass'ns, 531 U.S. 457, 475 (2001).

47. ^ *Whitman*, 531 U.S. at 475–76.

48. ^ 488 U.S. 361 (1989).

49. ^ 488 U.S. at 378.

50. ^ *E.g.*, Permian Basin Area Rate Cases, 390 U.S. 747 (1968) ; American Trucking Ass'ns v. Atchison, Topeka & Santa Fe Ry., 387 U.S. 397 (1967) .

51. ^ Chevron, U.S.A. v. NRDC, 467 U.S. 837, 842–45, 865–66 (1984)  ("[A]n agency to which Congress has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments." *Id.* at 865). *See also* Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 42–44, 46–48, 51–57 (1983)  (recognizing agency could have reversed its policy but finding reasons not supported on record).

52. ^ Yakus v. United States, 321 U.S. 414, 425 (1944) .

53. ^ Yakus v. United States, 321 U.S. 414, 426 (1944) ; Skinner v. Mid-America Pipeline Co., 490 U.S. 212, 218 (1989) ; American Light & Power Co. v. SEC, 329 U.S. 90, 107, 108 (1946) ; Opp Cotton Mills v. Administrator, 312 U.S. 126, 144 (1941) . It should be remembered that the Court has renounced strict review of economic regulation wholly through legislative enactment, forsaking substantive due process, so that review of the exercise of delegated power by the same relaxed standard forwards a consistent policy. *E.g.*, Ferguson v. Skrupa, 372 U.S. 726 (1963) ; Williamson v. Lee Optical Co., 348 U.S. 483 (1955) .

54. ^ Act of June 11, 1946, 60 Stat. 237, 5 U.S.C. §§ 551 -559. In NLRB v. Wyman-Gordon Co., 394 U.S. 759 (1969) , six Justices agreed that a Board proceeding had been in fact rule-making and not adjudication and that the APA should have been complied with. The Board won the particular case, however, because of a coalescence of divergent views of the Justices, but the Board has since reversed a policy of not resorting to formal rule-making.

55. ^ *E.g.*, Goldberg v. Kelly, 397 U.S. 254 (1970) ; Wisconsin v. Constantineau, 400 U.S. 433 (1971) .

56. ^ City of New York v. FCC, 486 U.S. 57, 63–64 (1988) ; Louisiana PSC v. FCC, 476 U.S. 355, 368–69 (1986) ; Fidelity Fed. Savings & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153–54 (1982) .

57. ^ *E.g.*, The Brig Aurora, 11 U.S. (7 Cr.) 382 (1813) .

58. ^ *E.g.*, J. W. Hampton, Jr. & Co. v. United States, 276 U.S. 394 (1928) ; Field v. Clark, 143 U.S. 649 (1892) .

4/8/22, 11:30 AM                    The Nature and Scope of Permissible Delegations | Constitution Annotated | Congress.gov | Library of Congress

Case 1:22-cv-01144-RC Document 2-11 Filed 05/02/22 Page 14 of 14

59. ⌃ 312 U.S. 126 (1941) ↗.

60. ⌃ *See* ↗ 28 U.S.C. § 2072 ↗. In Davis v. United States, 411 U.S. 233, 241 (1973) ↗, the Court referred in passing to the supersession of statutes without evincing any doubts about the validity of the results. When Congress amended the Rules Enabling Acts in the 100th Congress, Pub. L. No. 100-702, 102 Stat. 4642, 4648, *amending* ↗ 28 U.S.C. § 2072 ↗, the House would have altered supersession, but the Senate disagreed, the House acquiesced, and the old provision remained. *See* H.R. 4807, H. Rᴇᴘ. Nᴏ. 100-889, 100th Cong., 2d sess. (1988), 27-29; 134 Cᴏɴɢ Rᴇᴄ. 23,573–84 (1988), *id.* at 31,051–52 (Sen. Heflin); *id.* at 31,872 (Rep. Kastenmeier).